DIRECTOR OF PATUXENT INSTITUTION *v.*
DANIELS

AVEY *v.* DIRECTOR OF PATUXENT
INSTITUTION ᴇᴛ ᴀʟ.

(Three Appeals in One Record)

[No. 520, September Term, 1965.]

18

*Decided June 3, 1966.*

*Petition for reconsideration and rehearing filed June 17, 1966, denied June 21, 1966.*

The cause was argued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY, BARNES and McWILLIAMS, JJ., and McLAUGHLIN, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*Karl G. Feissner,* with whom were *Daniel Clifford Smith* and *Alpern & Feissner* on the brief, for Daniels and Avey.

*Robert C. Murphy, Deputy Attorney General,* and *Franklin Goldstein, Assistant Attorney General,* with whom were *Thomas B. Finan, Attorney General,* and *Howard Chasanow, Deputy State's Attorney for Prince George's County,* on the brief, for the Director of the Patuxent Institution.

HAMMOND, J., delivered the opinion of the Court.

Samuel Daniels, an appellee and cross-appellant, was found to be a defective delinquent in 1959 by the Circuit Court for Prince George's County pursuant to the provisions of the Maryland Defective Delinquent Act, Code (1964 Supp.), Art. 31B (the Act), and was remanded to Patuxent Institution, the place of confinement, and treatment and rehabilitation if possible, established by the Act for those judicially determined to be de-

fective delinquents. In 1964 he sought a redetermination of his status in the same trial court, as permitted by the Act, a jury again decided that he was a defective delinquent, and again he was remanded to Patuxent. He sought leave to appeal to this Court in accordance with the procedure provided by the Act. In *Daniels v. Director*, 238 Md. 80, we rejected all his contentions save the one that the trial court had denied him the right and opportunity to show that he was not being given treatment for the causes of his defective delinquency as contemplated by the Act, but rather was being punished by being confined indefinitely, probably for life, in a penal institution in violation of his constitutional rights. Leave to appeal was granted as to this claim and the case remanded for a determination of whether the continued detention of Daniels in Patuxent is a violation of his constitutional rights in light of the questions as to the constitutionality of the Act in operation posed by the United States Court of Appeals for the Fourth Circuit in *Sas v. State of Maryland*, 334 F. 2d 506, in June 1964.

The present appeal is essentially from the determination of the trial court on remand that the Act in operation and application is constitutional but it comes to us in an unusual posture which requires explanation. After the taking of extensive testimony and but a day or two before the opinion of the Circuit Court for Prince George's County was to be filed, it was discovered for the first time that, contrary to what was indicated by the docket entries of his criminal trial in 1958, which showed a plea of guilty to storehouse breaking and larceny, Daniels had actually then entered a plea of guilty only of petty larceny and that it was on the conviction following this plea that he was sentenced to not more than three years in the Maryland State Reformatory for Males and subsequently referred to Patuxent for diagnosis as a possible defective delinquent, found to be one and committed to Patuxent. After this discovery, it was realized that there was at least a strong probability that Daniels' conviction of petty larceny was not, under § 6 of Art. 31B, one of the crimes which would serve as a basis for referral to and confinement in Patuxent and Daniels' lawyer on behalf of Bradley Arlington Avey, then in Patuxent for diagnosis as a possible defective delinquent, concededly properly so under

the Act, filed a bill for a declaratory judgment that Avey was being held in violation of his constitutional rights, assigning all of the general reasons that had been urged in behalf of Daniels and were under consideration in his case. The State answered the bill and the Avey case was consolidated with the Daniels case upon a stipulation that all of the testimony and exhibits in the Daniels case (except as applied to Daniels individually) "shall be accepted in evidence in this [the Avey] case and shall be considered by the court to the same extent as if the testimony had been testified to in this case and as if the exhibits had been produced in this case." Thereupon on December 15, 1965, the court filed its opinion in the consolidated cases that the Act is constitutional and is being constitutionally applied, both generally and specifically as to Daniels and its order as to Avey adopting, to the extent of its general application, its opinion in *Daniels* "including the Findings of Fact and conclusions of law," and ordering "that it is hereby declared that Article 31B of the Annotated Code of Maryland (1957) is constitutional * * * [and] that no constitutional rights of the plaintiff, Bradley Arlington Avey, are being violated by his confinement at Patuxent Institution * * *."

The court nevertheless ordered that Daniels be released forthwith for the reason that he had been improperly found to be a defective delinquent in that the supposed basis for his referral to Patuxent under § 6 of Art. 31B did not exist and he had served all sentences imposed upon him. The court held that if legally necessary it would treat Daniels' petition for redetermination as one for the writ of habeas corpus, and cast aside the arguments of the State (a) that the crime of petty larceny was a crime of violence (the commission of which would have justified referral to Patuxent under § 6 of Art. 31B, and (b) that the crime of escape from Patuxent for which he was convicted in Howard County, before he was determined originally to be a defective delinquent, constituted a second crime which was enough under § 6 of Art. 31B ("two or more convictions for any offenses or crimes punishable by imprisonment in a criminal court of this State") to justify the determination that he was a defective delinquent. The State, through the Director of Patuxent Institution, appealed the order releasing Daniels,

24

and Daniels cross-appealed the findings that the Act was constitutional and being constitutionally applied, and Avey also appealed the declaratory order of constitutionality.[1]

We agree with the trial court that Daniels had to be released because under § 6 of Art. 31B there can be no referral to Patuxent for a diagnosis of possible defective delinquency until one or more of the five prerequisites of conviction for a specified crime therein set out exists and none did when Daniels was referred, and with its underlying views that the Circuit Court for Prince George's County lacked power to make the referral and, that assuming the Circuit Court for Howard County (as the court which last sentenced the defendant and so under § 6 (e) of Art. 31B the only court then with power to do so) could have made the referral after Daniels was convicted of escape, it did not do so.

We pass to further consideration of the merits and of the *Sas* case, which triggered the consideration of the constitutionality of the Act in actual operation.

In *Sas* five inmates of Patuxent Institution, one of whom was John Sas, had filed petitions for writs of habeas corpus in the United States District Court in Baltimore, seeking their releases from Patuxent on the ground that the Act, under which they were confined, is unconstitutional, and had appealed when their petitions were denied. In its opinion in the consolidated appeals, the Circuit Court of Appeals found the Act and its statutory definition of a defective delinquent to be facially constitutional but, almost inexplicably, read the decision in *Palmer v. State*, 215 Md. 142, 137 A. 2d 119, to hold that this Court had implanted the term "psychopath" into the statutory definition as always synonymous with the term "emotionally unbalanced" and posed the question whether such an interpretation "has rendered the definition too vague to be constitutionally acceptable." The Court went on to reject claims that the Act upon its face violated the equal protection clause of the four-

---

1. The court on the same day it ordered Daniels released stayed its order, pending appeal, and eight days later heard a motion to vacate the stay which resulted in an indefinite postponement of the motion upon an agreement that Daniels would be paroled under the supervision of Patuxent.

teenth amendment or denied procedural due process, saying on the latter point:

> "An examination of the trial and hearing provisions of the Act can leave no doubt that it places around the accused more procedural safeguards than any of the Acts of a similar nature which have been upheld by the courts against this attack."

Further on this point, the Court noted and answered the claims of John Sas and his confreres that the Act is unconstitutional because, first, it permits experts to testify over objection to an opinion as to defective delinquency based in part on background hearsay matters, in departure from common law rules of evidence; second, it improperly permits experts to express their opinions on the ultimate issue before the jury, that is, whether the inmate is a defective delinquent within the meaning of the Act; and third, it provides that the State must prove its case only by the civil measure of greater weight of the evidence and not by the criminal rule of beyond a reasonable doubt, saying:

> "The answer to all of these objections is that with respect to state action repeated decisions of the Supreme Court have put it beyond the range of further debate that the 'due process' clause of the fourteenth amendment has not the effect of imposing upon the states any particular form or mode of procedure, so long as the essential rights of notice and a hearing, or opportunity to be heard, before a competent tribunal are not interfered with."

The *Sas* appellate court thereupon had a further caveat, in spite of the facially adequate procedural safeguards of the Act which it had recognized, whether "in application these safeguards result in basic fairness of procedure imposed upon the state by the fourteenth amendment."

The *Sas* appellate court next chose to concern itself with two further facets of the actual working of the Act. Taking heed of the fact that the Act in basic concept and actual practice substitutes for the traditional view that every legally sane person has

a free choice between doing right and doing wrong, the view that there is a determinable category of legally sane (but for practical purposes insane) persons who because of intellectual or emotional defects have demonstrated a propensity towards criminal behavior which they cannot control, the court said of the Act:

> "For those in the category who are treatable it would substitute psychiatric treatment for punishment in the conventional sense and would free them from confinement, not when they have 'paid their debt to society,' but when they have been sufficiently cured to make it reasonably safe to release them. With this humanitarian and progressive approach to the problem no person who has deplored the inadequacies of conventional penological practices can complain. But a statute though 'fair on its face and impartial in appearance' may be fraught with the possibility of abuse in that if not administered in the spirit in which it is conceived it can become a mere devise for warehousing the obnoxious and antisocial elements of society."

Finally, the *Sas* opinion discussed those who are confined in Patuxent Institution by reason of offenses against property and suggested a final question to be answered on the facts at the trial level, saying:

> "Many jurists and laymen would seriously question the wisdom of the practice of indefinitely confining young men under these circumstances. Deficiencies in staff, facilities, and finances would undermine the efficacy of the Institution and the justification for the law, and ultimately the constitutionality of its application." [2]

2. Interestingly, on November 8, 1965, Judge Cardin of the Supreme Bench of Baltimore City found John Sas not to be still a defective delinquent and released him from Patuxent, in part on Sas's testimony (found in State's Exhibit 64) that "I have learned quite a bit [from Patuxent Institution]. This is what I would like to take advantage of, if I am allowed to go home today" (Tr. 36) and his further testimony (Tr. 38): "The thoughts that

In the Circuit Court for Prince George's County, on remand, Chief Judge Digges and Judge Powers faithfully followed the mandate of this Court and made, in the words of *Sas,* "a critical analysis [of the Act] on the broadest of terms after a careful factual development of its present operation." Eight days were devoted to the hearing of oral testimony from eminent experts such as Dr. Karl A. Menninger, Dr. Manfred Guttmacher, Dr. Philip Roche, and Dr. Jerome Frank, and from laymen skilled and experienced in the area (their testimony covers some eight hundred printed pages in the record), and the receipt of some sixty-four written or printed exhibits.[3]

Judges Digges and Powers concluded that (a) the Act's statutory definition of a defective delinquent as applied by the Maryland courts is sufficiently definite, precise and meaningful to permit its practical application within constitutional limitations; (b) the objectives of the Act are effectively implemented in practice to a degree sufficient to support its classification as a civil process and to justify the failure to provide in it all criminal procedural safeguards; (c) its statutory procedures, as written and applied, do not offend constitutional requirements of due process and confrontation; (d) the Act does not, as

---

I have now are different. I think of security, of giving myself now to my family as they have given themselves to me all these years." Just following this he was asked:

"Do you think this new insight has come from your confinement in the institution?"

and his response was:

"Yes, I do. I have gotten so I have taken an interest in a lot of people, in other inmates. I have seen so much of my youth wasted away, and I have seen this in a lot of other people. I think I can face the truth now. That has been my trouble, I never could face the truth before."

He testified further (Tr. 39):

"I am seriously thinking of making contacts with the boys' club of the Police Department. I think I can be of great help to these people and, at the same time, help myself. As Doctor Boslow pointed out, when you help others you help yourself."

3. The scholastic and professional qualifications of these gentlemen and others who testified are listed in Appendix B of the opinion of the trial court set out below, as are the Exhibits.

28

written and as applied, offend the prohibition against cruel and unusual punishment because it is construed to include those whose actual offenses have been only against property rights but who, on the basis of their defective delinquency, are likely to be a danger in the future to persons; (e) Patuxent Institution does in fact furnish effective treatment for treatable defective delinquents, as distinguished from other criminal lawbreakers, and this fact supports the Act against claims of violation of the equal protection clause of the fourteenth amendment.

We have read the record with meticulous care and considered it at length with full deliberation, and we are convinced that the conclusions reached by the trial court rest on a foundation of sound law properly applied to proven justifying facts. The careful and thorough opinion of Judges Digges and Powers and its Appendix A "Court's Findings of Fact" and Appendix B "Trial Summary" are adopted as the expression of the reasons we agree with the conclusions of the trial court and are to be printed as part of the opinion herein of this Court, as follows:

This matter is now before this Court by direction of the Court of Appeals in its opinion reported in 238 Md., page 80, whereby we are required to "determine whether his [Daniels'] continued detention at Patuxent [Institution], is a violation of his constitutional rights," after full hearing and making provision for adequate record of the proceedings with an explicit finding of fact and express conclusions of law.[1]

We are directed to do this in light of the decision of the Federal Fourth Circuit Court of Appeals in *Sas v. Maryland,* 334 F. 2d 506 (1964). The opinion in that case states that Maryland's Defective Delinquent Statute [Code, (1957) Article 31B], "is so serious a departure from traditional concepts of justice that it deserves a critical analysis on the broadest of terms after a careful factual development of its present operation."

We, accordingly, construe the scope of the remand by the Court of Appeals to be as broad as the Fourth Circuit's direction to the District Court in *Sas,* and a license from the Court

---

1. For trial procedure followed, see Appendix B.

of Appeals to this Court to reach appropriate conclusions of law based on factual findings even if, in view of U. S. Supreme Court decisions, the legal result may be inconsistent with previous State decisions. See *Murel v. Director*, 240 Md. 258, 213 A. 2d 576 (1965).

In August of 1958, after waiver of jurisdiction by the Juvenile Court, the petitioner (hereinafter referred to as either "petitioner" or "Daniels") having been assigned counsel, entered a plea of guilty to larceny, and was sentenced to serve three years in the Maryland State Reformatory for Males.[2]

Thereafter, following appropriate procedures, as directed by Article 31B of the Code, (the Act), a hearing was held on July 29, 1959, to determine whether or not Daniels was a Defective Delinquent under the definition in the Act. He was represented by counsel, a jury determined that he was a Defective Delinquent, following which he was committed to Patuxent Institution.

After the three year period provided in the statute had expired, Daniels petitioned for a determination as to whether he was still a Defective Delinquent. Counsel was assigned and on July 22, 1964, a hearing was held with the jury determining that he was still a Defective Delinquent. He then asked the Court of Appeals for leave to appeal from this decision, assigning five reasons. This application was denied as to all contentions relating to the admission and sufficiency of evidence and to the qualification of the jurors, but was granted and the proceeding remanded to this Court solely for review of petitioner's contention concerning the Constitutionality of the Defective Delinquent Law and its application to him.

---

2. We note that under §341, Article 27 of the Code, the maximum prison sentence for petty larceny, to which Daniels pled guilty, is eighteen months instead of the three years to which he was sentenced. However, since the petitioner was adjudicated a defective delinquent less than eleven months after his conviction, and in light of *Hunter v. Warden*, 198 Md. 655, 80 A. 2d 611 (1951), which holds that a sentence is invalid only to the extent of its excess over the maximum, this apparent error has no significance in the matter before us.

All questions raised by all parties can be decided by answering the following:

I. Is the statutory definition of a Defective Delinquent as applied by the Maryland Courts sufficiently definitive to permit its practical application within Federal Constitutional limitations.

II. Are the objectives of the Act sufficiently implemented in its actual administration to support its categorization as a civil procedure, and to justify the elimination of conventional criminal procedural safeguards.

III. Are the procedures embodied in the statute and in Daniels' trial applied in such a manner as to offend the due process requirements of the Fifth Amendment and Fourteenth Amendment and the confrontation requirements of the Sixth Amendment.

IV. Does the Act, as interpreted and applied, permitting a defective delinquent to be found to be an actual danger to society, offend the Eighth Amendment's prohibition against cruel and unusual punishment when, as construed, it includes individuals whose conduct indicates a danger to property rights rather than violence to persons.

V. Does Patuxent in fact furnish treatment for treatable defective delinquents, as distinguished from other lawbreakers, which would support the Act under the "equal protection" clause of the Fourteenth Amendment.

A detailed finding of relevant facts is for convenience designated as Appendix "A", though nonetheless a part of this opinion, and will be referred to when appropriate in our conclusions.

## I.

### Legal Sufficiency of the Statutory Definition

*General:*

Within the larger group of violators of the criminal law whose criminality is related to or results from mental abnormalities, it has long been recognized that there, in fact, exists a smaller group who are legally sane (under the M'Naghten, Durham or other accepted tests for sanity in criminal cases) and therefore responsible for their acts but who nevertheless persist in

antisocial behavior, have either deficient intellect or emotional unbalance, or both, and are lacking in control. Those in this group demonstrate a persistent tendency to repeat their crimes and experience dictates that they are not usually influenced by conventional penological or reformative measures. For many years informed criminologists, penologists, jurists and psychiatrists have recognized that individuals falling within this category, while constituting an acute menace to society because of their criminal behavior, are in fact suffering from mental illness and should be dealt with in a manner other than are conventional criminals.

Maryland, after considerable research and study by a number of commissions and committees, pioneered in this approach with the adoption in 1951 of what is generally referred to as the Defective Delinquent Law, Article 31B, Annotated Code (1957), *Gee v. State,* 239 Md. 604 at 609, 212 A. 2d 269 (1965). The United States Court of Appeals for the Fourth Circuit in *Sas v. Maryland,* supra, said of this legislation:

> ". . . the statute rejects the age old concept that every legally sane person possesses in equal degree the free will to choose between doing right and doing wrong. Instead it substitutes the concept that there is a category of legally sane persons who by reason of mental or emotional deficiencies 'evidence a propensity toward criminal activity', which they are incapable of controlling. For those in the category who are treatable it would substitute psychiatric treatment for punishment in the conventional sense and would free them from confinement, not when they have 'paid their debt to society', but when they have been sufficiently cured to make it reasonably safe to release them. With this humanitarian and progressive approach to the problem no person who has deplored the inadequacies of conventional penological practices can complain."

The legislative history leading to the enactment of the Defective Delinquent Law adequately supports this statement of the *Sas* court. It further equally supports the conclusion that of paramount concern and interest to the Maryland Legislature

was the welfare of the community which would best be protected by treatment rather than punishment, with confinement for that purpose for an indefinite period, and when there no longer reasonably appears to exist a danger to the community, release is permitted.

The Court of Appeals recognized the existence of this legislative purpose in a series of cases which have stated that the Act is for the protection of society from persons who evidence a propensity toward criminal activity, (*Simmons v. Director,* 227 Md. 661, 177 A. 2d 409 (1962); *McElroy v. State,* 211 Md. 385, 127 A. 2d 380 (1956)); that there is emphasis on confinement and treatment, rather than punishment and deterrence (*Eggleston v. State,* 209 Md. 504, 121 A. 2d 698 (1956)); but that such confinement is preventive as well as therapeutic, (*Simmons v. Director,* 231 Md. 618, 189 A. 2d 644 (1963)); and that the statute designed to implement this concept is civil in nature and not unlike a civil inquiry into the sanity of a person (*Eggleston v. State, supra*). Patuxent Institution was established and opened on January 1, 1955, and has been characterized by the Court of Appeals as "neither a prison, a hospital, nor an insane asylum, but an institution which exercises some of the functions of all three." *Eggleston v. State, supra,* 513.

That this state has the power to restrain the liberty of persons found to be dangerous to the health and safety of the community is clear if the restraint is founded upon a legislative enactment providing a definite and certain description of a recognized group of persons dangerous to the health and safety of the people which is susceptible of ascertainment by proof. Legislation meeting this test does not violate the "due process" and "equal protection" clauses of the Fourteenth Amendment of the Federal Constitution. *Jacobson v. Massachusetts,* 197 U. S. 11, 49 L. ed. 643, 25 S. Ct. 358 (1905); *Buck v. Bell,* 274 U. S. 200, 71 L. ed. 1000, 47 S. Ct. 584 (1927); *Eggleston v. State, supra.* This was the conclusion also reached by the Fourth Circuit Court in *Sas v. Maryland, supra,* when Judge Bell stated at page 509:

". . . it is within the power of the state to segregate from among its lawbreakers a class or category

which is dangerous to the public safety and to confine this group for the purpose of treatment or for the purpose of protecting the public from further depredations."

*The Maryland Definition:*

This brings us to the question of whether or not the statutory definition of a defective delinquent as defined in Article 31B and as applied by the Maryland courts is sufficiently definitive to permit its practical application within constitutional limitations. The Act, Section 5, defines a defective delinquent as:

". . . an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment."

It was noted by the *Sas* Court that this definition "was carefully drawn to conform to the definition approved by the [Supreme] Court [of the United States] in the Minnesota case," referring to *Minnesota ex rel. Pearson v. Probate Court,* 309 U. S. 270, 84 L. ed. 744, 60 S. Ct. 523 (1940), wherein the Supreme Court upheld the constitutionality of Minnesota Sexual Psychopath Law.

From the voluminous testimony presented in this case we determine that the conclusion of the Fourth Circuit Court in *Sas* is justified when that court decided that the statutory definition was facially constitutional. We say this because the evidence before us clearly shows that there does in fact exist a class or group of persons falling within the definition, constituting a danger to the health and safety of people and who, with the aid of medical expert testimony, after appropriate examination, using recognized medical techniques, are discernible and recognizable by lay persons, including judge or jury. In fact, it is clear from the testimony of nearly all the eminent medical ex-

perts specializing in psychiatry testifying in this case that the defective delinquent definition as contained in the statute is no less vague and difficult of understanding or difficult of application to individual persons than are the M'Naghten or Durham rules used in testing criminal responsibility, or the civil insanity rule used in Maryland to determine the need for confinement in a mental hospital of persons suffering from mental disease sufficient to cause them to be "a danger to themselves or others". These same eminent medical experts, however, agree that there in fact does exist a medically recognizable group falling clearly within the definition in the Act's definition, and we so find.

The real problem in this case, posed by *Sas*, seems not to arise from the words of the statute but is created by the interpretation and application of the statute by our Court of Appeals in *Palmer v. State*, 215 Md. 142, 137 A. 2d 119 (1957). Judge Bell in *Sas* poses a question requiring a decision as to whether the Court of Appeals in *Palmer*, by referring to the term "emotional unbalance" as meaning a "psychopath" or a person with a "psychopathic personality" has rendered the definition so vague and meaningless that it fails to meet the test for definiteness required by the Fourteenth Amendment. It is clear from the testimony before us in this case that the term "psychopath" has many meanings and has no universally accepted medical meaning. Because of this fact its use is troublesome. It means different things to different people, including psychiatrists. For that reason it was dropped as a medical term from the "Diagnostic and Statistical Manual" of the American Psychiatric Association when its latest publication of acceptable psychiatric terms was adopted and published in 1952. (Exhibit No. 33). It has been suggested that the term "sociopath" has been substituted for the class of persons formerly referred to by many psychiatrists using the term "psychopath". However, even the term "sociopath" is, by many eminent psychiatrists, including Doctors Guttmacher and Menninger, rejected for the same reason that the term "psychopath" was discarded by the Psychiatric Society. These doctors say there is no need to equate the term "emotionally unbalanced persons" to "psychopaths" or "sociopaths", because they say the Maryland definition is in

itself sufficiently clear and does not need, medically speaking, the use of either of these terms as an aid for diagnostic or other purposes in identifying the group or in determining whether or not a given individual falls within the class the Legislature was attempting to describe or in communicating that finding to other professional or lay persons.

We reach the conclusion from the testimony that if, in fact, the Maryland Court of Appeals had placed the word "psychopath" without further explanation of the use of the term into the statutory definition that it then would be too indefinite to meet the constitutional test. We conclude, however, that careful reading of the *Palmer* case does not dictate this result, first of all because the *Palmer* opinion merely stated that an emotionally unbalanced person, as that term was used in the statute, referred to that group of people generally known as "psychopaths" as described by Guttmacher and Weihofen in their book "Psychiatry and the Law". The *Palmer* opinion clearly defines psychopath as they used the term by quoting from this book to be a "group of mentally abnormal individuals who on clinical examination do not fit into the categories of psychoneurosis, psychosis, or intellectual deficiency.[3] These patients are generally without complaints; they do not exhibit abnormally pronounced mood disturbances, nor do they present the distortions of thought which become so manifestly evident in delusions and hallucinations. Furthermore, they are not intellectually retarded. Yet they are constantly in difficulty because of their abnormalities of behavior. They are unable to conform to the standards of their social group, and they are tragic failures in establishing lasting and satisfying interpersonal relationships . . . ['The] incapacity to conduct oneself 'with decency and propriety in the business of life' is the outstanding characteristic of the true psychopath."

It seems clear to us, therefore, that the Court of Appeals was merely saying that the persons described by Guttmacher and Weihofen as above quoted are "unbalanced people" as that term is used in the Defective Delinquent Act. The term "psycho-

---

3. Dr. Guttmacher now concludes this statement is in error because research demonstrates there at times does exist intellectual deficiency.

path" as thus defined does have a definite meaning and describes a medically recognizable group of individuals. We conclude, therefore, that if the legislative enactment as interpreted by the Court of Appeals had defined an emotionally unbalanced person as being a psychopath with no further amplification of the meaning of the word "psychopath", that its use in that manner would destroy its present acceptability as meeting the requirements of the Fourteenth Amendment. It seems clear to us that a reading of the *Palmer* case, in light of the testimony before us in this case, justifies the conclusion that the Court of Appeals was not in fact importing the term "psychopath" into the statutory definition but that they were merely incidentally seeking another way of describing some emotionally unbalanced persons. In other words, its use in the opinion was merely an effort to seek a synonym for the term "emotional unbalance" and not, in fact, a positive holding that the term "psychopath", minus a description of what was meant by the use of that term, was being engrafted into and made a part of the definition. We believe, in view of the testimony, particularly of Doctors Menninger and Guttmacher, and the fact that the term is no longer and was not at the time of the *Palmer* opinion, a part of the nomenclature recommended by the American Psychiatric Association, that it is unfortunate that the term was used by the *Palmer* court. Note is made of the fact that in spite of the great many cases before the Court of Appeals dealing with the Defective Delinquent Act and its statutory definition, the term "psychopath" has only been used by that Court one other time. See *Cowman v. State,* 220 Md. 207, 151 A. 2d 903 (1959). Clearly, in *Palmer* the real issue decided by the Court of Appeals was not whether the term "emotional unbalance" meant "psychopath" but whether or not a group of people described by Guttmacher and Weihofen were those intended to be encompassed by the statutory definition. We conclude that in the light of the testimony in this case there is no need to give any further medical description to the nonmedical term "emotional unbalance" and that if the matter is ever squarely before the Court of Appeals that Court will conclude that the term "psychopath" is not a part of the definition, is not a synonym for emotional unbalance, but that the term "emotional unbalance"

as used in the Act refers to a medically recognized psychiatrically disordered person who demonstrates "persistent aggravated antisocial or criminal behavior", and who exhibits a type of psychiatric disorder manifested by deep-seated emotional conflicts which distort the individual's attitude toward society, and of society's attitude toward him, resulting in an uncontrollable desire and need to create continual hostile acts toward society and which is uncontrollable by the individual. It was in this context, we feel, that the doctors were describing a particular type individual when they used the term "psychopath" and it is in that context that the Court of Appeals used the term "psychopath" as defined by Guttmacher and Weihofen. With this description of the term "psychopath" we feel that the use of the term in the Palmer case does not destroy the validity of the statutory definition so as to cause it to become vague and meaningless, as was found to be a fact by the Ninth Federal Circuit Court of Appeals. In the statute involved in that case the term "psychopath" was used without further amplification or definition, hence its use compelled the holding of insufficient clarity to meet constitutional requirements. *Fleuti v. Rosenberg*, 302 F. 2d 652 (1962). Accordingly, we hold that the attack on the legal sufficiency of the statutory definition as applied by the Maryland Courts is not sustained.

## II.

### Civil Nature of the Act.

The Maryland Court of Appeals in *Eggleston v. State, supra,* decided the Act was regulatory in character and therefore not penal but civil in nature. It becomes vital that there be a proper determination as to the correctness of this conclusion because only if the statute is regulatory can the precise criminal procedures required to uphold the constitutionality of a penal statute be dispensed with. If, on the other hand, the act is regulatory and therefore civil in nature, the Fourteenth Amendment of the Constitution's requirement is met if there is provided reasonable safeguards under the circumstances which include consideration of the fact that persons may be deprived of their liberty for the good of society and themselves. It seems clear that if there exists affirmative evidence that the act results from a legislative intent to regulate rather than punish, the law is

38

deemed to be civil in nature. *Kennedy v. Mendoza-Martinez*, 372 U. S. 144, 9 L. ed. 2d 644, 83 S. Ct. 554 (1963). We conclude from the evidence before us that the legislative history of the Defective Delinquent Act [4] clearly demonstrates that its sole objective and purpose was not penal but an effort to segregate a known group of mentally disordered people who are found guilty of criminal acts, by confining them in an institution housing only members of their group in a sole effort to protect society and provide treatment to effect, if possible, a cure of the illness. From the history it is clear that the legislative imposition of sanctions by restraining the individual results from studies that indicate that such restraint is necessary both for the protection of society and to provide medical treatment to further curative measures. In short, it is the State's effort to determine the cause of a criminal's acts and if associated with mental disorder to accomplish improvement under psychiatric supervision so that he may hopefully be released, no longer a danger to himself or society. This act now before the Court is so similar in design and has a legislative purpose so similar to the act that was before the Supreme Court in *Minnesota, ex rel. Pearson v. Probate Court, supra*, that we believe the decision of that court upholding the constitutionality of the Minnesota Sexual Psychopath Law is direct authority for our conclusion that this act is civil in nature. We further point out that the purpose of this act is so closely akin to the so-called "Sexual Psychopath" laws enforced in some twenty (20) states and the District of Columbia, that the decisions of the Courts in those jurisdictions that each of their laws is civil in nature is ample authority to conclude that the Maryland Act is regulatory. *State v. Madary*, 178 Neb. 383, 133 N. W. 2d 583 (1965); *People v. Levy*, 151 Cal. App. 2d 460, 311 P. 2d 897 (1957); *Miller v. Overholser*, 92 U. S. App. D. C. 110, 206 F. 2d 415 (1953); *In re Miller*, 98 N. H. 107, 95 A. 2d 116 (1953). See also cases cited in annotation under "Sexual Psychopaths," 24 A.L.R. 2d 350.

Assuming, however, that contrary to our finding here, there exists no conclusive evidence of legislative intent as to whether

4. See Legislative History, Appendix B.

or not the act is penal or civil in nature, the answer to this question must be determined from the face of the Act after considering the following:

> ". . . whether the sanction involves an affirmative disability or restraint; whether it has historically been regarded as a punishment; whether it comes into play only on a finding of scienter; whether its operation will promote the traditional aims of punishment, that is, retribution and deterrence; whether the behavior to which it applies is already a crime; whether an alternative purpose to which it may rationally be connected is assignable for it; and whether it appears excessive in relation to the alternative purpose assigned."
> *Kennedy v. Mendoza-Martinez, supra.*

After considering these factors, we conclude that the statute on its face supports the conclusion that the act is civil in nature. We find this for the following reasons: Even though the sanction does involve an affirmative restraint it is provided only because it is deemed best for the protection of society and best for the protection and treatment of the individual that he be placed in a maximum security institution maintained solely for defective delinquents and not for other members of the criminal element. Historically, this type of sanction or restraint to accomplish the purposes of the Act has not been regarded as punishment but regulatory and is more akin to those laws consistently held to be civil in nature applicable to the "sexual psychopaths." Also this is true of laws involving loss of liberty by restraint of many mentally ill persons in mental hospitals in all of the states. The Maryland Act does not come into play on a finding of "scienter," because the person involved must before referral for diagnosis, already have been convicted of at least one criminal act and can be determined to be a "defective delinquent" only after there has been an intensive mental examination. The law on its face clearly shows that it was not enacted to promote the aims of punishment, retribution and deterrence, but its only purpose is for the protection of society, and the treatment of the individual to effectuate a cure if at all possible. The Act clearly demonstrates that "defective delin-

quency" is not a crime but is a mental condition that can only be diagnosed and determined to exist after a finding of guilt. There exist alternate purposes which are valid functions of the State as a part of its police power. They are the protection of society, coupled with a humanitarian attempt to treat, cure and rehabilitate those suffering from abnormal mental functioning. The sanctions or incarceration provided by the Act are not excessive in relation to these alternative purposes since most reputable psychiatrists agree that treatment cannot be related to a fixed period of confinement, as the length of time necessary for treatment and cure, if it can be obtained, is uncertain. In addition, experience has demonstrated that the indeterminate confinement is itself therapeutic, as it has a tendency to generate and motivate the individual to participate in the institutional program in order to help himself.

Based on the testimony, we fear that without the indeterminate provision in the Act, violence would be done to its basic concepts and purposes, and much of the good sought by this legislation would go for naught. The very qualities making up the nature of an individual at Patuxent, with his warped attitudes and distorted outlook, would dictate to him that he antisocially wait out his allotted time, resisting introspection and any kind of reappraisal of his makeup, and refusing to cooperate in receiving available therapy to any degree that would give promise of his ultimate rehabilitation.

We find that on the basis of present psychiatric and psychological knowledge, it can be accurately predicted that certain individuals will commit crimes. In cases where it is believed that a person at Patuxent still maintains his propensity for crime, it would be a tragic destruction of the purposes of this legislation, a disservice to society and not the least of the errors, a serious injustice to the individual to release him, uncured.

We therefore conclude that the Maryland Defective Delinquent Act is civil in nature under either test; that is, such a conclusion results from the legislative history and also the Act on its face supports this finding after taking into account the tests laid down by the Supreme Court in *Kennedy*.

The real question, however, Judge Bell asks in *Sas*, is ". . . whether the proposed objectives of the Act are sufficiently im-

plemented in its actual administration to support its categorization as a civil procedure and justify the elimination of conventional criminal procedural safeguards . . .". We are persuaded that there is much force in the respondent's argument that the answer to this question is a legislative rather than a judicial function. The *Kennedy* case seems to support the conclusion that the court's sole concern in this area is to determine whether or not the act is *reasonably calculated* to achieve its legislative purpose, leaving for the legislative and executive branches of the government a determination of whether in fact it is accomplishing its legislative purpose.

It would seem that the court's further concern after concluding that the Act was reasonably calculated to achieve its legislative purpose, only exists if the other branches of the government fail to act after a clear showing that it is ineffectual in accomplishing its purpose. We are aware of no responsible opinion of any professional group, and certainly there is no opinion of any of the witnesses testifying in this case, that the Act is clearly ineffectual in accomplishing its legislative purpose. On the contrary we conclude from the testimony by following the requirements of the Act, together with a utilization of medically accepted treatment techniques now being carried out at Patuxent, provides a procedure reasonably calculated to achieve the stated legislative purposes.

The testimony, we believe, justifies our determining that this legislation has proven to be a benefit to society as well as the individual and is becoming more so as results of knowledge gained from experiences at Patuxent and developments in psychiatry are evaluated and utilized.

Ten years is too short a time for anyone to know the extent of the ultimate accomplishments which may result from this vastly complex undertaking. Pioneering of necessity involves trial and error, but only in this way does civilization advance. What has been done up to now has not been ineffective and augurs well for the future.

All agree that the humane objectives, the protection of society and concern for the welfare of mentally ill persons are laudable. A benefit not to be overlooked is that the inmate while continuing to manifest pronounced symptoms of potentially dangerous

antisocial behavior is protected, while confined, from the consequences to him, which would likely result from his being at large. We conclude that the Court has no power to interfere until its ineffectiveness is clearly demonstrated and the other branches of the government fail to act.

The petitioner argues that only a small number of individuals have been paroled or released during the ten (10) years of Patuxent's operation. Accepting this statement as true, we believe that such a result is understandable when it is considered that Patuxent was opened in 1955, that there necessarily ensued a period of nearly a year before there could be an adjudication after an examination that any individual was, in fact, a defective delinquent. The medical professional witnesses agreed that such a disorder is difficult of treatment and there exists no time table for cure. The illness does not await the discovery of a cure. The Act and its operation is admittedly an experimental one but we find nothing in the evidence to justify any conclusion that as administered it is unworkable or that it is not achieving its stated objectives. This we find is the conclusion of responsible psychiatrists, physicians, criminologists, and jurists who have studied in depth Patuxent Institution as it is being operated under the Defective Delinquent Act.

We further conclude from the evidence that the legislative and executive branches of the government are keeping abreast of and familiar with the operation of Patuxent Institution and the internal administration at Patuxent, in turn, is continually re-evaluating its treatment and release program in light of new developments in the psychiatric-medical field. See Research Report No. 29, Research Division of the Legislative Council of Maryland, December, 1959 (Ex. No. 15); *Report of Commission to Study and Re-Evaluate Patuxent Institution,* Legislative Council of the General Assembly of Maryland, January 25, 1961, (Ex. No. 17); *Interim Report of Commission to Study Changes and Basis of Selection for Patuxent Institution,* December 15, 1964 (Ex. No. 21); *Report of the Committee of the American Psychiatric Association on the Patuxent Institution,* December 20, 1960 (Ex. No. 16).

We likewise conclude from all the evidence that the Act is not only intended to achieve its legislative purpose but the ad-

ministrative procedures pursuant thereto are in accordance with the latest medically accepted practices and as administered are reasonably calculated to accomplish the Act's desired result—that is the protection of society, accompanied by an attempt to provide medical help for those unfortunate individuals who because of mental illness demonstrate a propensity to commit criminal acts. This is all the Federal Constitution requires. *Kennedy v. Mendoza-Martinez, supra.*

### III.

*Application of Procedures in Relation to Due Process and Confrontation*

*Procedural Requirements:*

The procedural requirements of the Act include these safeguards to the defendant:

1. He must be convicted and sentenced in a Maryland Court for a crime.

2. The crime must be of a particular category: (a) a felony or (b) a misdemeanor punishable by imprisonment in the penitentiary or (c) one of violence, or (d) a sex crime involving physical force, disparity of age, or of an uncontrolled or repetitive nature, or (e) two or more convictions for offenses punishable by imprisonment in a criminal court of this State.

3. There must be a request for examination by: (a) the Department of Correction, (b) the State's Attorney's office, (c) such person himself, (d) his attorney, or (e) the Court.

4. The Court must order the examination.

5. A copy of the order for examination must be served on the person to be examined.

6. The person must still be confined.

7. The examination must be made by at least three persons, one of whom must be (a) a medical physician, one a (b) psychiatrist and one a (c) psychologist.

8. A majority of the examiners must conclude that the person is a defective delinquent.

9. The person is entitled on request to be examined by a private psychiatrist of his own choice at the expense of the State unless he, himself, has asked for the original examination.

10. The person must, after the examination with an affirmative result, be brought before the Court and advised of the substance of the report and the pendency of the hearing.

11. He is entitled to counsel of his choice, or to competent counsel appointed by the Court.

12. Counsel has access to all records, reports and papers of the institution relating to the person and to all papers in the possession of the Court bearing on his case.

13. The person has a choice of a court or jury trial.

14. He may make application for leave to appeal from the order holding him to be a defective delinquent, although such appeal does not lie as a matter of right.

He, in addition to the specific statutory safeguards, has full opportunity to summon witnesses and to present evidence. Also, he has available to him all discovery procedure permitted under the Maryland Rules in civil cases, which is much broader than in criminal cases, including the taking of depositions, the use of interrogatories and demands for admission of facts.

". . . An examination of the trial and hearing provisions of the Act can leave no doubt that it places around the accused more procedural safeguards than any of the Acts of a similar nature which have been upheld by the Courts against this attack." *Sas v. Maryland, supra.* Also see *Minnesota, ex rel. Pearson v. Probate Court, supra* and *Buck v. Bell, supra.*

We hold that the mandatory procedural safeguards were applied in the case before us and the safeguards not mandatory were available to Daniels and therefore that the language of the Act in general, and as applied here, adequately gratifies the requirements of due process.

While acknowledging the existence of these statutory and procedural safeguards. Daniels nevertheless contends that he has not been accorded due process in several respects, as hereafter enumerated and discussed.

*Hearsay Evidence:*

While hearsay evidence was received in Daniels' hearing when the Institution's report and finding were received in evidence, this was not violative of the Sixth Amendment because this was not a criminal prosecution, as heretofore discussed under heading II. The evidence under attack is part of a history

and can be refuted under the procedure, both by a denial by the defendant and by the testimony of any other witnesses he sees fit to call.

Moreover, there appears to be nothing sacrosanct about the use of hearsay evidence; the weight is determined by the trier of the issue, and there are numerous exceptions under which hearsay evidence is properly received.

*Kay v. U. S.*, 255 F. 2d 476, cert. denied, 358 U. S. 825, 3 L. ed 2d 65 (1958):

> "The power of the Congress and of a state legislature to provide for the admission of evidence is not subject to . . . arbitrary limitation . . . They may carve out a new exception to the hearsay rule, without violating constitutional rights, where there is reasonable necessity for it and where it is supported by an adequate basis for assurance that the evidence has those qualities of reliability and trustworthiness attributed to other evidence admissible under long established exceptions to the hearsay rule.", citing *Tot v. U. S.*, 319 U. S. 463, 87 L. ed 1519, 63 S. Ct. 1241 (1943).

It was said in *Sas, supra,* (footnote at page 516):

> ". . . An act, which deprives sane men of their liberty by confining them under severe discipline with or without treatment requires a basic fairness of procedure and substance—'implicit in the concept of ordered liberty'—to comport with the guaranties of our National Constitution. By these standards, the Supreme Court reviewed the Minnesota statute which concededly is as civil in nature as the Maryland statute."

We believe that even in a civil proceeding the Fourteenth Amendment's guarantee of due process requires a test of whether lack of confrontation (or receiving hearsay evidence) may result in the denial of such basic rights as to offend the Constitution.

The very recent case of *Holm v. Wyoming,* 404 P. 2d 740

(1965), was relied on by Daniels in support of his position with respect to due process, particularly as to hearsay evidence. That case held that the part of a statute pertaining to mentally ill persons, which provides that the Court should not be bound by rules of evidence, would abolish court procedures and was therefore void. We perceive of few things of less general interest or more inappropriateness than our comment on the correctness of that learned Court's conclusion. However, we do readily distinguish that case from ours for the reason that contrary to the Wyoming law under attack here the rules of evidence and court procedures are not abolished but carefully preserved.

The discovery and other procedures which, under the statute and within Maryland's Rules, may be utilized by the defendant affords full protection against any possible damage resulting from the broadening of the hearsay rule in these hearings. We find no Supreme Court cases which we construe as overruling *Jacobson, Bell* or *Pearson.*

After exposing the litmus to the atmosphere of reasonable necessity, we conclude that the mandatory procedures and the safeguards available, provide basic fairness and did not violate Daniels' right to due process.

*Appellate Restrictions:*

It is here contended that petitioner's rights were further violated because the procedure does not permit an absolute right of appeal, nor does the appellate court in applications for appeal under the Act consider the question of weight and sufficiency of the evidence or in the case of a pauper, review a transcript of the proceedings below.

There is no discrimination against indigents in the appellate provisions of the act or the established practice. Leave to appeal is granted when the application appears to have merit. Transcripts of the proceedings are not considered in such applications whether the applicant is rich or poor. When leave to appeal is granted, and only then, a transcript is required. If the applicant is without means to bear the cost, it is provided at public expense. Counsel is furnished to indigents at public expense.

"It is true that a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all. See, e.g. *McKane v. Durston,* 153 U. S. 684, 687, 688, 38 L. ed 867-869, 14 S. Ct. 913. But that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty." *Griffin v. Illinois,* 351 U. S. 12, 100 L. ed 891, 76 S. Ct. 585 (1956).

We find that those found to be defective delinquents under the Act are not discriminated against in their applications to appeal and that the limitations on appeal are within the constitutionally allowable area.

We find that the limitations on the absolute right to appeal provided in the Act are not discriminative against any particular category of defective delinquents, and that special provisions concerning appeals in defective delinquent cases are within the proper prerogatives of the legislature and not offensive to the Federal Constitution under the decision in *Griffin.*

*Double Jeopardy:*

Daniels believes that because he is confined at Patuxent after the expiration of his original sentence, his Constitutional rights have been violated in that he has been twice placed in jeopardy for the same offense.

It has been held in *Moquin v. State,* 216 Md. 524, 140 A. 2d 914 (1958), that while the Maryland Constitution contains no guarantee against double jeopardy and the Fifth Amendment of the United States Constitution is not applicable to the state,[5] it is a well settled rule of the common law that one may not be subjected to double jeopardy. Also see *Eggleston v. State, supra.*

The short answer to the petitioner's objection is that the commitment to Patuxent was a civil proceeding and does not involve his being placed in jeopardy for the commission of a crime.

---

5. Assuming that the Federal Courts would not now agree that the Fifth Amendment is not applicable to the states, our conclusion on this point would be the same.

*Ultimate Issue:*

Another point raised by petitioner in his claim that he has been denied due process is that in the proceedings resulting in his commitment as a defective delinquent, an expert was permitted to express an opinion on the ultimate issue, that is, whether or not he was a defective delinquent.

Since the remand in this case the Court of Appeals has in three cases since *Sas,* upheld the validity of this procedure. *Wames v. Director,* 240 Md. 39, 212 A. 2d 467, *Murel v. Director,* 240 Md. 258, 213 A. 2d 576, and *Alt v. Director,* 240 Md. 262, 213 A. 2d 746 (1965).

Also see "Expert Opinion and the Ultimate Issue Doctrine", M.L.R. XXII, 32, stating: "That an expert opinion may touch upon an ultimate issue apparently no longer matters.", since the modern trend in Maryland and elsewhere is toward a liberalization of the opinion rule, to permit the reception of such evidence. See *Shivers v. Carnaggio,* 223 Md. 585, 165 A. 2d 898 (1960).

We can see no Federal Constitutional impediment against a State regulating the admissibility of this type of evidence.

## IV.

### Inclusion of Offenses Solely Against Property [6]

We must summarily reject Daniels' contention that by his commitment to Patuxent, cruel and unusual punishment is being inflicted upon him, in violation of his rights under the Eighth Amendment. While it is true that the offense of which he was guilty and which became an indispensable ingredient to his confinement at Patuxent, was one against property not involving violence to the person, yet to confine such offenders appears to fall clearly within the area of valid legislative prerogatives (1) because Patuxent is not designed to punish but its purpose is to provide protective custody and treatment for members of a mentally ill group, until institutional confinement is no longer reasonably necessary. When this mental illness exists it is no

---

6. Offenses solely against property have been held to come within the Act. *Cowman v. State,* 220 Md. 207, 151 A. 2d 903 (1959).

less real because an outward manifestation has been an offense against property than an offense against a person. (2) One who is a menace to the property of others easily fits within the definition of a danger to society, and (3) the legislative power is not abused when it concludes that one only violating property rights is potentially a danger to the person of others. An arsonist may not know that there are occupants of the building he is setting fire to. A storehousebreaker may encounter the owner in the building. As Dr. Menninger said: "If you break one law, if you have nerved yourself up to defy social regulations and defy the order, and break one law, a sudden shift in the situation is very likely to precipitate the breaking of another law . . . Many prisoners start out with the idea of taking something, they are detected, they panic and then a subsequent act occurs which is very dangerous." We conclude that it is difficult if not impossible to limit consideration under the Act to persons whose only convictions involved violence to persons, since there always exists potential physical danger in crimes intended to concern only property.

## V.

### Quality of Treatment

We found from the evidence that treatment, in varying degrees, in a broad sense, is furnished to all defective delinquents at Patuxent. We have earlier concluded that the establishment by the legislature of a special category of criminal known as defective delinquents is within its constitutional powers.

The rules to be applied in assaying the constitutional sufficiency of a law involving the question of equal protection are stated in *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 55 L. ed 369, 31 S. Ct. 337 (1911) :

"1. The equal-protection clause of the 14th Amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore is purely arbitrary.

"2. A classification having some reasonable basis does not offend against that clause merely because it

is not made with mathematical nicety, or because in practice it results in some inequality.

"3. When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed.

"4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary."

We believe the questioned Act here under scrutiny passes the foregoing test and hence Daniels' contention that he has not been afforded his right to equal protection of the laws provided by the Fourteenth Amendment, fails.

Justice Holmes, speaking for the Court in *Buck v. Bell, supra,* said: "But the answer is that the law does all that is needed when it does all that it can, indicates a policy, applies it to all within the lines, and seeks to bring within the lines all similarly situated so far and so fast as its means allow."

Having concluded as a fact that Daniels has received or had had available to him (See Appendix "A") all of the treatment techniques available to other inmates at Patuxent, and also as generally recognized and utilized in the field of psychiatry it is obvious that he is not being denied equal protection of the law.

## CONCLUSION

We conclude that the Act is constitutional and is being constitutionally applied, both generally and specifically as to Daniels.

## APPENDIX A

### COURT'S FINDINGS OF FACT

1. *Background and History.*

It has been long recognized by many people, including criminologists, penologists, psychiatrists and judges, that there exists a group of offenders whose criminality results from and is related to a definite category of mental abnormality. These offenders have been of particular concern to society because usu-

ally they have long histories of persistent antisocial behavior which results from lack of emotional balance and control, and in some cases is accompanied by deficient intelligence.

It is clear that these individuals have a tendency to repeat their crimes, and they do not respond nor are they materially influenced by ordinary penological reformative measures as provided in the conventional penal institution.

Those studying the subject have recognized that these individuals, even though constituting an acute menace to society because of their criminal acts, are in fact mentally ill and should not be dealt with primarily as criminals and confined in a conventional prison, but should be placed in a special type institution. Such an institution they agree should be staffed with psychiatrists, psychologists, sociologists and social workers, and should also include educational, vocational and recreational facilities and instructors, all of which enables the use of recognized psychiatric and psychological procedures and techniques on an intensive basis, for the purpose of changing and rehabilitating the character and personality make-up of the person, so that upon his release, he will, hopefully, assume a useful role in society.

The advocates of this approach are cognizant of the fact that mental illness suffered by these offenders often is exceedingly difficult of cure, and will usually require confinement for considerable duration in order effectively to complete the treatment process. They recommend the use of an indeterminate sentence to an institution such as described above so that the offender's release will be related to a cure of the illness, and not merely to the passage of time. This concept recognizes, also, that some offenders may never be cured, and hence the indeterminate sentence would accomplish the protection of society but result in their confinement for life.

After extensive studies,[7] Maryland adopted these concepts in

---

7. The first spark resulted from the death sentence, more than thirty years ago, of a murderer named Duker, whose prior behavior would clearly have brought him within the defective delinquent law. The sentencing judge and reprieving governor both drew attention to the need for legislation to meet the problems created by this type of individual. Later several other vicious and predictable crimes increased interest in this subject. Judge Jerome Robinson, who, as a recent law graduate, attended the Duker trial,

1951 when the Defective Delinquent Act was passed, and its operative facility, Patuxent Institution was completed and opened on January 1, 1955.

The initial cost of the Institution was $3,902,000 and the total cost of the physical plant to the present amounts to $7,-579,560. The facility is located about midway between Baltimore and Washington, at Jessup, Maryland, is comprised of ten acres, fenced. Facilities include six guard houses, a multi-sectioned three-story defective delinquent building, a three-story diagnostic center, a kitchen-dining room, a gymnasium-theater, vocational shops and school area, a hospital (containing laboratory facilities, including electroencephalographic and electro-cardiographic rooms, dental offices, examination and treatment rooms), administrative offices, a psychiatric isolation section, as well as other structures and units. The entire complex is interconnected by a ground-level tunnel.

Both the defective delinquent building and diagnostic center have tiers of cells containing standard items of furniture. The rated capacity of the Institution is 622 inmates, with the committed inmates being housed in the defective delinquent building, and those in a diagnostic status being confined in the diagnostic center.

Additional improvements are planned, which include a warehouse structure, home for maintenance supervisors, school building, chapel, additional shop space, and a "half-way" house.[8]

---

later, as a member of the State Legislature, was largely responsible for the passage of a Joint Resolution calling upon the governor to appoint a commission to study and report on the need for legislation in this area. The result of the recommendations of this commission was the appointment by the Legislative Council of a committee which, with the assistance of a staff of experts, drafted a bill which became Article 31B upon its enactment in 1951. Judge Robinson served on the governor's commission, was chairman of the Legislative Council's Committee and after the passage of the Act served on both the Advisory Board and the Institutional Board of Review at Patuxent, until his appointment to the Municipal Court of Baltimore in 1961. For further history of this legislation see *Gee v. State, supra.*

8. By Dr. Guttmacher's testimony, "A half-way house is a place where men can be housed under much less surveillance than exists at the institution before they are finally released, during which

The testimony discloses that from the Institution's opening in January, 1955, to July 1, 1965, a ten-year period, the Institution admitted 1,483 persons, of whom 1,222 were diagnosed by the staff.[9] Of this number, 826 were recommended by the staff for commitment and original defective delinquent hearings were held. Either the court or jury found 581, or 82 percent, of those individuals to be defective delinquents. Up to July 1, 1965, there have been 347 rehearings under the provisions of the Act, and of that number, 185, or 53 percent, were found still to be defective delinquents.

Patuxent's per capita costs have increased from $2,562.00 in the fiscal year 1956 (for 188 patients) to $4,602.00 for the fiscal year ended June 30, 1965 (for 487 patients). Comparison of these per capita costs with those lower costs prevailing in State mental hospitals and in the State's penal and corrective institutions is indicative of Patuxent's increasingly extensive treatment program.

The operating budget has increased from $476,467.00 for the fiscal year ending June 30, 1956, to $2,348,428.00 for the fiscal year to end June 30, 1966, with the proposed budget for the fiscal year 1967, heretofore submitted to the Budget Bureau, increasing to $2,917,000.00, with the amount of $54,000.00 being currently allocated to the institutional research program and $157,-895.00 to its current educational, vocational, recreational and religious programs.

2. *Statutory Definition.*

The Maryland statutory definition of a Defective Delinquent, as applied by the Maryland Courts, is sufficiently definitive to permit its practical application within constitutional limitations, in that:

a. The definition sets forth, in precise non-technical terms, readily understood by the laity, a psychiatrically accepted and

---

time they would have jobs so that there would be a better way of gauging their ability to function in the community."

**9.** The explanation for the difference between these two figures is largely that during the early period of Patuxent's operation a number of inmates from correctional institutions in the State were transferred there only to provide physical maintenance at the Institution, yet were carried as admitted inmates.

recognized mental or personality disorder which can be ascertained or diagnosed with a reasonable degree of unanimity among experienced psychiatrists.

(1) In determining whether a person demonstrates "persistent aggravated antisocial or criminal behavior" such as "evidences a propensity toward criminal activity", within the meaning of the statutory definition, such phrase must be accorded a non-technical, non-medical meaning. So viewed, it sets forth a clear, sufficient, readily determinable standard; and may be said to exist where such behavior is destructive and persists in a chronic repetitive pattern; in contradistinction to antisocial behavior which is merely occasional or episodic. The criteria employed in making such determination is the individual's past history and record.

(2) In determining whether a person, who has demonstrated persistent aggravated antisocial or criminal behavior exhibits such "intellectual deficiency . . . as to clearly demonstrate an actual danger to society", such term must be accorded its well-recognized psychiatric-psychological meaning. So considered, it is a classification capable of being diagnosed with a high degree of unanimity by objective and clinical testing, non-mechanically applied, and properly evaluated, with prime consideration given in such evaluation to the person's entire life pattern.[10]

(3) In determining whether a person, who has demonstrated "persistent aggravated antisocial or criminal behavior", exhibits "emotional unbalance . . . as to clearly constitute an actual danger to society", within the meaning of the statutory definition, such term, although non-medical in origin, is generally understood by psychiatrists in Maryland and the surrounding area, in the context of its use in the statutory definition, to refer to a definite type of medically recognized psychiatric disorder manifested by deep-seated emotional conflicts which distort the individual's attitude toward society, and of society's attitude toward him, resulting in an uncontrollable desire and need to

---

10. On August 15, 1965, there were no inmates at Patuxent who were solely intellectually deficient. Patients in this group are rarely referred to the institution, since they are usually so defective in intelligence that they are found not responsible by the courts and referred to mental hospitals.

create hostile acts against society—this distortion or "characterological crippling" having repetitive characteristics which the individual is incapable of controlling and which, through mental mechanisms, impels him to carry out such antisocial acts; and, so viewed, such term is sufficiently definite that the minds of experts in the field usually agree as to what is meant by such term; and that such condition may exist in a person who is intellectually defective, as well as one who is not.[11]

(4) In determining whether a person, who meets the other statutory criteria for inclusion within the definition of a "defective delinquent", also "demonstrates an actual danger to society", within the ambit of the definition, such term must be accorded its common meaning and, so viewed, such determination is to be made primarily on the basis of the empirical tests of his established behavior—it being factually difficult, in making such determination, to limit consideration to persons whose crimes have constituted only a danger to life or limb of other persons, since there is potential physical danger involved in crimes committed solely against property.

b. It is the general behavioral pattern, and the psychological and emotional makeup of the individual, which identifies and delineates him as a "defective delinquent" under the Maryland Act and it is wholly unnecessary to employ psychiatric terms or labels, such as "sociopath" or "psychopath" in order to determine whether a person comes within the statutory definition of a defective delinquent.

(1) Although, with rare exceptions, individuals adjudged defective delinquents under the Maryland Act would be drawn from a class designated by some psychiatrists as "sociopaths" or "psychopaths", the Maryland definition is in no way dependent for its validity upon the use of any such psychiatric terms, labels or other naming devices.

(2) It seems clear, from the evidence, that so rapid is the progress of learning about the operation and disturbances of the mental function that professional nomenclature has not kept

---

11. Up to August 15, 1965, out of a total of 379 committed patients, 274 had demonstrated emotional unbalance and the remaining 105, including Daniels, exhibited a combination of intellectual deficiency and emotional unbalance.

abreast of these developments, and therefore such terms that have been used by psychiatrists and others, as "psychopath" and "sociopath" have today no universally accepted meaning by members of the psychiatric profession, and may therefore be meaningless terms, unless the user further defines the type of personality to which he refers, by the use of the word. In fact, the word "psychopath" was dropped from the nomenclature adopted by the American Psychiatric Association in 1952. However, whether or not "psychopath" or "sociopath" are valid psychiatric terms is not vital or significant to the coverage, scope and application of the Maryland definition of a defective delinquent. This is so because the limits of such definition are neither broadened, narrowed, nor in any way controlled by reference to these terms.

c. The Maryland definition of a defective delinquent is as definite, and to some more definite, and as easy or easier to apply by most of those concerned than either the M'Naghten or Durham Rules for determining criminal responsibility.

b. The Maryland definition of a defective delinquent is as definite and accurate as the long standing civil test in Maryland to determine insanity (i.e., that the individual, because of his mental condition, is a danger to himself or others).

e. Criminal behavior, *per se,* does not make one a defective delinquent under the Maryland definition.

f. The defective delinquent is not psychotic and does not suffer from any form of delusions, hallucinations, phobias, obsessions, anxiety states or depressions different in kind from the normal person and therefore psychotics are of necessity excluded from the Maryland definition of a defective delinquent.

g. Neither mental nor emotional deficiency, or both, make a person a defective delinquent, as in addition he must have demonstrated "persistent aggravated antisocial or criminal behavior" clearly constituting "an actual danger to society", and have been convicted and sentenced for a particular crime.

h. About eighty percent of convicted criminals would not fall within the statutory definition of a defective delinquent, since, unlike defective delinquents, these individuals, though socially disordered, are not, psychiatrically speaking, significantly deviated from what is considered normal and are not hostile to

society in the manner characteristic of a defective delinquent. Those within the eighty percentile group are frequently referred to as "normal" or "habitual" criminals, these terms being employed to distinguish this majority group of criminals from the minority of about twenty percent who are the defective delinquents sought to be reached by the Act.

3. *Application of Procedures.*

We assume generally as to the seven (7) witness inmates, based on their testimony and an examination of their institutional records, and we find specifically as to Daniels, that the examinations for defective delinquency were conducted in accordance with the statutory requirements, and consistent with procedures now generally accepted medically.

The institutional medical team, in examining any individual properly referred to it, employs recognized psychiatric techniques, including, among other things, a psychiatric interview and evaluation in depth, a full battery of psychological tests, full sociological and social work studies, including electroencephalographic studies, review of past history and records, including police, juvenile, penal and hospital records; and, in addition, personal interviews with the accused's family, when feasible, and with the accused, are held. These procedures are the accepted practice in matters involving psychiatric evaluation and the techniques employed in state and private mental hospitals, as well as by private physicians, all of which are essential to any accurate psychiatric diagnosis. Opportunity is afforded to the accused, after full discussion, to dispute any data collected by the institution and, if a material conflict arises, the institution customarily conducts further investigation, and discussion with the inmate. If the disputed matter cannot be resolved, the existence of the conflict is noted on the inmate's institutional record, and evaluation of the individual is made in light of all reliable information, both disputed and otherwise, with due regard being given to the fact that there is a dispute. Diagnosis is usually completed within 90 days of admission to the institution and the psychiatrist who testifies in court must have interviewed the inmate, have participated in the staff conference before making the recommendation for commitment, and be personally familiar with the case.

58

*4. Treatment of Inmates.*

Patuxent Institution furnishes treatment for inmates and presently experiences no deficiencies in staff, facilities, or finances substantially undermining the efficacy of the institution and the justification for the act, in that:

a. The aim of the treatment program at Patuxent is to develop internal controls within the individual in order that he may learn sufficient restraint to become a useful member of society. Otherwise stated, such aim is to enable defective delinquents, through treatment, to control their tensions, and, more specifically, to help the individual gain insight into his behavior, to accept responsibility for himself and others, to adjust with relationship to his peers and authority figures, to tolerate frustration and postpone gratification of instinctional demands.

b. The treatment program for defective delinquents has both formal and informal aspects and exists on all levels of communication between the inmates and their institutional environment. Underlying the treatment program is a philosophy which recognizes the desirability for total rehabilitation of the person, rather than mere improvement in his mental or emotional status. In addition to psychotherapeutics such as individual and group therapy, the treatment program, in furtherance of this aim, includes educational, vocational, religious, and recreational programs, together with provision for a highly structured social system, or "therapeutic milieu" within the institution. The graded tier system which, with its inclusion of tier counseling, is designed to build internal restraint, being based on the hypothesis that rewarding behavior which is socially desirable and personally beneficial to the inmate increases the frequency with which such behavior occurs and reduces the tendency toward antagonistic and undesirable behavior. In short, Patuxent utilizes a medically accepted treatment program adapted to the mental and emotional condition of the inmates.

c. Since defective delinquents usually require more than normal incentive to be motivated, cannot easily tolerate lack of discipline, and are deficient in ability to control their conflicts, their effectual treatment can best be carried out in a secure institutional environment, such as provided by Patuxent, with a definite reward and punishment system. Such treatment is not

available and cannot feasibly be made available in State mental hospitals or State penal institutions.

d. The conventional mental hospital, whether State or private, deals with a distinctly different group of patients than Patuxent, in that within the former institutions are found individuals who, for the most part, have internalized their conflicts and do not "act out" against society, and thus such institutions can be operated as "open" hospitals. One of the chief characteristics of the defective delinquent is his inability to internalize these conflicts, resulting in "acting out" antisocial behavior. Moreover, all committed inmates at Patuxent have been found to be, in varying degrees, a danger to society, thus Patuxent must be operated as a maximum security institution. Experience has shown that when individuals possessing the characteristics of the defective delinquent are confined within mental hospitals, they are disruptive to the normal institutional program.

e. Confinement of defective delinquents at Patuxent, rather than in the State mental hospitals, has relieved what formerly was a most difficult situation and has made it possible and desirable for such mental hospitals to develop better "open" hospital programs for its general population, with greater freedom of movement.

f. The penal and correctional institutions under the jurisdiction of the Department of Correction have been ineffectual in developing or providing the specialized treatment and attention which defective delinquents require, and experience has indicated that when individuals possessing the characteristics of the defective delinquent are incarcerated in conventional penal institutions they are disruptive to the normal institutional program. Confinement of defective delinquents at Patuxent, rather than in the State's penal institutions, has enabled such institutions to develop more effective programs for the conventional prison population.

g. Both quantitatively and qualitatively, Patuxent's treatment program is more effective for the defective delinquent type person than that provided in the State's penal and correctional institutions.

h. The State's penal and correctional institutions are basic-

ally without functioning psychiatric treatment programs,[12] and have no program even remotely approximating the graded tier concept in effect at Patuxent. Separation of inmates by tiers, in penal institutions of this State, is based purely on convenience to the operation and security.

i. Although treatment at Patuxent is not as intensive in the area of individual psychotherapeutic attention as that provided in private mental hospitals (though usually at prohibitive cost to the average citizen), treatment at Patuxent is superior in its milieu therapy, group therapy and post release programs to that provided by State or private mental hospitals, and is more comprehensive than either.

j. The operating budget requests, as well as the fiscal requirements, of Patuxent have been realistically met by the State as demonstrated by the figures heretofore given and the fact that the expenditures have increased year by year.

k. Patuxent presently provides effectual treatment for all treatable defective delinquents, including Daniels, denying treatment to none, in that:

(1) Patuxent's professional staff is adequate and competent as beginning August 15, 1965, the institution was authorized to employ twelve full-time psychiatrists (9.58 being then employed), nine psychologists (5.5 being then employed), and fourteen social workers (13 being then employed). With 485 patients on August 15, 1965, the professional staff to patient ratio was in full compliance with mental hospital staff standards promulgated by the American Psychiatric Association, and was materially higher than such ratios prevailing in the State penal and correctional institutions and in State mental hospitals in Maryland, as well as elsewhere in the country generally. Additionally, professional services of Patuxent's various advisory boards are available and are of value in the treatment program.

(2) Patuxent's Institutional Director, who has held the position since its opening, is a highly competent psychiatrist enjoying an international reputation.

(3) Patuxent's professional staff is and has been dedicated

---

12. At present there are no full-time, and only four part-time, psychiatrists fulfilling any duties at the State's correctional institutions, with a total population of about 5000 inmates.

and determined to help inmates rehabilitate themselves. The relationship between the professional staff and the inmate population is generally good.

(4) The institution makes continuous efforts to recruit qualified professional personnel of high caliber and does maintain salary levels competitive with those of institutions employing a professional staff of similar qualifications. Salary levels for the professional personnel at Patuxent are sufficient to attract and hold qualified personnel. This scale is among the highest of all of the States in the country.

(5) All inmates are considered treatable and susceptible of help at Patuxent and the institution uses most of the recognized psychiatric treatment techniques. Upon entry each inmate is especially assigned to a psychiatrist and a social worker.

(6) Group therapy, which now enjoys almost universal acceptance, and in which use Patuxent pioneered, is now generally considered by experts to be the most effective form of treatment for defective delinquents. Presently 86% of the committed patients are regularly receiving this form of psychotherapy. All patients are afforded an opportunity to receive such therapy, and non-participation is due either to recent commitment, improper attitude or outright refusal.

(7) Individual therapy is also provided at Patuxent on a selective basis, but presently only four inmates are receiving this form of treatment, as experience there has demonstrated that defective delinquents generally do not respond well to this form of therapy.

(8) All committed inmates by virtue of the milieu therapy program are in a broad sense constantly receiving treatment.

(9) Treatment at Patuxent is effective and the environmental (milieu) therapy, which is different from the State penal institutions, is a substantial contributing factor. During the hearing the impression left with us from the whole testimony of Sas and Aravanis further supports this finding.[13]

---

13. Aravanis, at the time of the hearing, had been out of Patuxent for about ten months, by Court action, contrary to the Institution's recommendation. Though he did not give Patuxent the credit, he attributed his rehabilitation to "thinking" with reference to himself and his future, which began while he was there. Sas,

(10) The indeterminate sentence can be an incentive to treatment and rehabilitation of inmates, having therapeutic value in and of itself by motivating some patients to become amenable to treatment and making clear to all patients that they must participate in the treatment process in order to be helped and released.

(11) Though helpful, it is not indispensable to effective treatment at Patuxent that individuals be willing patients.

(12) The fact that a member of the treating staff at a mental hospital may, on occasion, be required to testify in court in opposition to his patient's release from confinement, though not ideal, is not generally so disruptive of the physician-patient relationship as to interfere materially with successful treatment; and may, when occurring at an institution such as Patuxent, even have positive value in conditioning the inmate to gain insight into the reality of his situation. Patuxent is moving toward the modern tendency of separating the treating and administrative functions, in that the institutional Director or other administrative psychiatrist now testifies in most cases.

(13) As part of the treatment program, it is desirable to record all disciplinary infractions in order to gain insight into the individual's response to treatment, and of his adjustment and socialization within the institution.

(14) Twenty percent of Patuxent's population are presently beyond the time of their original sentences.

(15) The incidence of successful adjustment in the community, of inmates released on parole demonstrates the effectiveness of the treatment program. The post release experience of patients committed to Patuxent, over a ten-year period, shows that of 581 patients committed to the institution, 155, or 27%, were released with results as follows:

the principal in the consolidated *Sas* cases, has rendered his own case in the Federal Courts moot, by the adjudication, since this hearing, by a Baltimore Court, that he was no longer a defective delinquent. His testimony created a decided impression that during his stay at Patuxent there had been a recognition by him of a significant change in his mental makeup.

| Type of Release | Number | Risk Rate |
|---|---|---|
| I. Total released | 155 | |
| Violated | 64 | 41% |
| II. Court Releases without Institutional Board of Review (IBR) recommendation | 129 | |
| Violated | 62 | 48% |
| A. Above patients never on leave status | 104 | |
| Violated | 56 | 54% |
| B. Above patients who had been on parole but did not have IBR recommendation | 25 | |
| Violated | 7 | 28% |
| III. Total Released from Parole | 51 | |
| Violated | 9 | 18% |
| A. Same as item "B" in category II above | 25 | |
| Violated | 7 | 28% |
| B. IBR recommended | 26 | |
| Violated | 2 | 8% |

"Risk rate" is based on the number who violated in a given category. It shows the risk to society when there is a release from Defective-Delinquency of a patient who falls into one of the above categories.

(16) Patuxent adopted the "live in—work out" program and 57 inmates, on July 1, 1965, had participated in this program, with 16 violating its terms and committing new offenses.

(17) Patuxent's holiday and weekend leave program has resulted in a total of 148 inmates being given such leave up to July 1, 1965, 57 of whom started in 1965, being three times that of any previous year. Of these, 16 violated the terms of the leave program and 13 committed new offenses. All twenty-nine (29) were returned to the institution.

(18) A total of 24 inmates have been recommended by the Institutional Board of Review to the courts for outright release from their status as defective delinquents, nine such recommendations were made in 1965, twice the number as for all previous years of the institution's operation.

(19) The Patuxent treatment program includes a parole clinic, providing psychiatric aftercare to parolees. It meets regularly and provides both individual and group therapy for parolees, including family group therapy.

(20) Patuxent Institution, and the concept which it embodies, is accomplishing its purpose with increasing effectiveness, both because of the development of the science of psychiatry and from experience with the operation of the institution and dealing with the defective delinquent population there. It has been accorded positive recognition as a progressive institution, both nationally and internationally and among leading criminologists, penologists, psychiatrists and judges.[14]

---

14. Report of the Committee on "The Sociopathic Offender and the Courts," August 8, 1965, to the National Conference of State Trial Judges, of the Section of Judicial Administration, A.B.A.:

"The Committee's attention has lately centered on Patuxent Institution of Maryland. This is not because Patuxent is claimed or found to be the final or perfect solution to the problem of the sociopath. Rather, Patuxent deserves the Committee's objective and intensive study within the context expressed in *Sas v. State of Maryland, Director of Patuxent Institution*, [supra]:

' . . . The preoccupation of society with the problems of recidivism and rehabilitation, which show no signs of solution by conventional, penological methods, strongly support the efforts of Maryland to seek a new approach.'

"Many states, our 1964 Report disclosed, have some sort of a psychopathic offender law with provisions relating to possible treatment or observation, and to indefinite commitment, if the convicted offender is found to be covered by the law. Maryland's Defective Delinquent Law, not limited to sexual psychopaths in its coverage, is such a law. Maryland, however, to its great credit, is the only state that so far has designed, erected, and is operating an institution to treat, if curable, and to confine, if incurable, the sociopathic or dangerous offender.

"The Committee's personal observations at Patuxent reflect a genuine intent and effort to carry out the Maryland Law. Yet it is recognized that more than a superficial observation is needed to fairly evaluate Patuxent. Parenthetically though, it is astonishing that more European penologists than American penologists are visiting Patuxent . . . .
Moreover, this Conference is now informed that a Sub-

5. *Daniels' Treatment.*

As applied specifically to the petitioner we find as follows:

a. The aim of the treatment program for Daniels has not been necessarily to increase his intellectual performance, but to modify his social adaptabilities and his behavior to his environment, so that he can stay out in society as a functioning person, even though intellectually limited. Patuxent is attempting, through treatment, to have him modify his social behavior so as to handle his problems on a thinking rather than on an impulsive basis.

b. A specific educational program is available to and is participated in by Daniels.

c. Although Daniels has proven not to respond particularly well to group therapy, he is susceptible of help, through application of a simple reality group therapy program. His institutional record with regard to such therapy is lacking in relation to the results reached. However, we do find that all therapy utilized at Patuxent which is appropriate to his condition is available to him.

6. *Irregularities at the Institution.*

There was considerable testimony of various incidents and conditions at Patuxent which if accepted by us as fact would indicate at least lapses in the treatment program and the efficient operation of the Institution. This testimony, while not wholly rejected, does not show such degree of flagrancy as to have a bearing on the constitutional questions here involved, either generally, or specifically as to Daniels. However, we hope that bringing them to light will be noted by the staff for future guidance and reference.

7. *Statistical Evidence.*

We find that the statistical data as to the construction costs, maintenance and operation, as well as the statistical data relative to the referral diagnosis, commitment, treatment, parole and release of individuals at Patuxent is undisputed and therefore it is accepted as correct.

---

Committee of our Committee has been appointed to draft during the coming year a study in depth of Patuxent."

66

## APPENDIX B

### TRIAL SUMMARY

At several pre-trial conferences it was agreed that a large number of exhibits i. e. periodicals, statistical data as to the operation of Patuxent and other published material, should be received in evidence without objection. It was also agreed that there would not be objection to any evidence offered by either party except on the ground that it lacked materiality.

There was agreement that a number of expert witnesses suggested by the parties or by the Court be called and designated as "Court Witnesses" so as to afford ample opportunity for cross-examination by all parties after initial interrogation by the Court. The testimony of these witnesses was expected to provide the Court background and with both general and specific information by recognized experts regarding the Defective Delinquent Act and the operation of Patuxent. A further purpose was to provide information to permit a comparison between Patuxent, penal institutions and private and state mental hospitals. These witnesses included the following:

*Dr. Manfred S. Guttmacher:* Chief Medical Officer of the Supreme Bench of Baltimore; Professor of Psychiatry, Johns Hopkins University and University of Maryland; Chief Psychiatric Consultant, U. S. Second Army and Consultant to Veterans Administration; Salmon Lecturer, New York Academy of Medicine; Gimbel Lecturer, Stanford University; and Ray Lecturer, University of Minnesota; member of Advisory Committee to American Law Institute Committee drafting model penal code; Chairman, Legal Aspects of Psychiatry Committee, American Psychiatric Association; Psychiatric member, Committee of United Nations considering cause and treatment of crime; Chairman of Advisory Board for Defective Delinquents and member of Board of Patuxent Institution.

*Dr. Philip Q. Roche:* Professor, University of Pennsylvania, forensic medicine pertaining to psychiatry; Chairman, Psychiatric Board of American Bar Foundation; consultant, Judicial Conference regarding mental illness, District of Columbia; publisher of articles on forensic issues; Ray Lecturer, University of Michigan; Chairman, American Psychiatric Association Com-

mittee to survey Patuxent Institution; former psychiatrist Eastern State Penitentiary of Philadelphia.

*Dr. Karl A. Menninger:* of Topeka, Kansas, founder and Chief of Staff of Menninger Clinic, now Menninger Foundation, organizer of first psychiatric school; advisor to Director of Kansas State Mental and Penal Institutions; member of committee advising judges in formation of model sentencing act; psychiatric advisor to Air Force; psychiatric consultant for Strategic Air Command; author and lecturer of psychiatric subjects.

*Dr. Anna Maria Rosenberg:* Forensic Psychiatrist, head of treatment center for mentally disturbed criminals, known as Vanderhoeven Clinic in Utrecht, Holland.

*Dr. Harold M. Boslow:* Director, Patuxent Institution, Staff Psychiatrist, Veterans Administration; Medical Officer, Supreme Bench of Baltimore City; Faculty of Johns Hopkins School of Medicine; psychiatrist, Henry Phipps Psychiatric Clinic; consultant, Surgeon General, U. S. Second Army, American Hospital System and F. B. I.

*Dr. Jerome D. Frank:* Ph. D. in psychology at Harvard University; graduated from Harvard University Medical School in 1939; three-year residency at Johns Hopkins; acting Chief of Psychiatry at Walter Reed; full professor at Johns Hopkins since 1959; published "Persuasion and Healing"; on the Advisory Board of Patuxent since its founding.

*Dr. Isadore Tuerk:* Commissioner of Mental Hygiene, State of Maryland; psychiatrist, Clinical Director and later Superintendent of Spring Grove State Mental Hospital; Assistant Professor of Psychiatry, Johns Hopkins University; Associate Professor of Psychiatry, University of Maryland; consultant, U. S. Army Hospital, Ft. Meade; Editorial Staff of "Staff" Magazine, which is a publication of American Psychiatric Association; member of Review Committee of National Institution of Mental Health and author of books and articles.

*Hon. William S. Thomas:* Judge, Court of Common Pleas, Cuyahoga County (Cleveland) Ohio, recent appointee to U. S. District Court for the Northern District of Ohio; Chairman, Committee of the National Conference of State Trial Judges studying "The Sociopathic Offender and the Courts".

68

*Dr. Peter P. Lejins:* Professor of Sociology, University of Maryland; Director, Criminology Program, University of Maryland; President, Board of Juvenile Centers by appointment of Governor; member Governor's Commission on Children and Youth; President, Maryland Prisoners' Aid Association; consultant in area of correction and criminology to the Air Force and U. S. Army; member of the delegation of United States to the International Congress of the United Nations on Prevention of Crime and Treatment of Offenders; President of Washington Metropolitan Area Health and Welfare Council; past president of American Correctional Association; Chairman of Advisory Board of Maryland Children's Center.

*Vernon L. Pepersack:* Commissioner of Correction, State of Maryland; Warden eleven years, Maryland Penitentiary.

The Petitioner called the following expert witnesses:

*Dr. Ralph Meng:* Psychiatrist since 1944; service in Army including U. S. Disciplinary Barracks, Fort Leavenworth (Military Prison); Clinical Director, Crownsville State Hospital.

*Dr. Edward Schnoor:* Psychiatrist since 1957; Prison Psychiatrist, U. S. Naval Disciplinary Command two years.

*Dr. George Lassen:* Psychologist; Hogg Foundation Fellow; Chief Psychologist at Larue Carter Memorial Hospital; Assistant Professor, Department of Psychiatry, University of Arkansas School of Medicine; Diplomate, American Board of Examiners and Professional Psychology; Associate Professor of Psychology, Baltimore Junior College; Court Psychologist for the Circuit Court of Baltimore County; author of articles on psychology.

*Dr. Brian Crowley:* M. D. from Yale University in 1957; three years of psychiatric residency at St. Elizabeth's Hospital, Washington, D. C.

In addition, the Petitioner called as witnesses a number of Patuxent inmates, including John Sas, petitioner in the Sas case.

To complete the roster of witnesses mention is made that the Petitioner called an F. B. I. agent who investigated Patuxent inmate complaints and a witness to corroborate Daniels' denial of an incident mentioned in the history contained in his institutional records.

The Respondent called no witnesses but relied on Court witnesses as suggested by the parties.

The following exhibits were received in evidence with Court assigned numbers:

EXHIBIT
NUMBER

1  Transcript of Samuel Daniels' defective delinquency proceedings under Article 31 B, July 22, 1964.

2  Table listing the personnel classification, title, salary scale, incumbents, and length of service in present position in the Institution from August 15, 1955 through August 15, 1965.

3  Staff summary of treatability of inmates dated August 15, 1964.

4  "Explanation of the Definition of the Definition" from Patuxent Institution to the Office of the Attorney General for Maryland, September 29, 1964.

5  Composition and function of the Classification and Disciplinary Committees of Patuxent Institution, August 15, 1964.

6  Summary of psychotherapy as of August 15, 1964; September 15, 1964; March 18, 1965; and August 15, 1965.

7  Cell capacity report describing cell distribution by type and building location and distribution of standard cells by tier level and building location.

8  Distribution of patient population by: I Admission; II Diagnosis; III Committed; IV Total by graded tier level as of August 15, 1964, March 18, 1965, and August 15, 1965.

9  Duration of confinement statistics comparing original sentence with indeterminate sentence, March 3, 1965.

10  Summary of per capita costs for fiscal years 1956 through 1965 and estimates for 1966 and 1967, August 15, 1964 and August 15, 1965.

11  Chart comparing ratio of professional staff to patient population as of August 15, 1955 through 1965.

12  Summary of patient admission, diagnosis, commit-

70

EXHIBIT
NUMBER

  ment and discharge for fiscal years 1955 through 1965, dated February 25, 1965.

13 Patuxent Institution 1966 budget request.

14 Report of the Commission to Study Medico-Legal Psychiatry submitted to Governor Lane and the Maryland General Assembly December 28, 1948, John H. Skeen, Jr., Esq., Chairman.

15 Research Report No. 29 of the Research Division of the Maryland Legislative Council entitled "An Indeterminate Sentence Law for Defective Delinquents" submitted December, 1950.

16. Report of the Committee of the American Psychiatric Association on Patuxent Institution, Dr. Philip Q. Roche, Chairman, to The Hon. Roszel C. Thomsen, Chairman, Commission to Study and Re-evaluate the Patuxent Institution, December 20, 1960.

17 Report of the Commission to Study and Re-evaluate Patuxent Institution, Hon. Roszel C. Thomsen, Chairman, to Senator Della, Chairman of the Legislative Council, January 25, 1961.

18 "The Maryland Defective Delinquency Law: Psychiatric Implications for the Treatment of Antisocial Disorders under the Law;" by Boslow, Rosenthal and Gliedman.

19 "Methods and Experiences in Group Treatment of Defective Delinquents in Maryland" by Boslow, Rosenthal, Kandel and Manne. Reprinted from the Journal of Social Therapy, 1961.

20 "The Maryland Defective Delinquency Law — an Eight Year Follow-Up;" by Boslow and Kohlmeyer.

21 Interim Report of Commission to Study Changes and Basis of Selection for Patuxent Institution to Governor Tawes, December 17, 1964, The Hon. Roszel C. Thomsen, Chairman.

22 Report to the President, "A Proposed Program for National Action to Combat Mental Retardation." The President's Panel on Mental Retardation, October, 1962.

EXHIBIT
NUMBER

23    Report of the Task Force on Law. The President's Panel on Mental Retardation. The Hon. David L. Bazelon, Chairman, January, 1963.

24    "An Introduction to Mental Retardation;" U. S. Department of Health, Education and Welfare, June, 1965.

25    Mental Retardation, a National Plan for a National Problem. Chart Book published by The President's Panel on Mental Retardation, August, 1963.

26    Model of Patuxent Institution.

27    Patuxent Institution records of Samuel Daniels.

28    Interrogatories of Karl G. Feissner to Dr. Harold M. Boslow, March, 1964.

29    Request of petitioner Samuel Daniels for admission of facts, August 3, 1965.

30    "Verdict Guilty—Now What?" by Dr. Karl Menninger. Harpers Magazine, August, 1959 pp. 60-64.

31    Case of Herman Webb Duker. Opinion and sentence by Joseph N. Ulman, Judge in the Criminal Court of Baltimore City on October 3, 1931. The Statement by Governor Albert C. Ritchie commuting the sentence of Duker to life imprisonment.

32    Interrogatories and answer to No. 13 dated September 8, 1965 filed. Document entitled "Correctional Officer Distribution, 1960-1965."

33    "Diagnostic and Statistical Manual, Mental Disorders" published by The American Psychiatric Association, 1952.

34    Patuxent Institution record of George Aravanis.

35    Patuxent Institution record of John Sas.

36    List of patients at Patuxent for two years or more who are not in group therapy.

37    Handwritten list of patients at Patuxent receiving no therapy whatsoever.

38    Patuxent Institution record of William Capparella.

39    Information and Department of Correction statistics sent to Robert C. Murphy, Deputy Attorney General

72

Exhibit
Number

of Maryland by Commissioner Vernon L. Pepersack, Department of Correction, August 18, 1964.

40 Letter from Loyal B. Calkins, Chief Psychologist, Maryland Department of Correction, to Commissioner Vernon L. Pepersack stating percentage of inmates within Maryland Penitentiary, Maryland House of Correction and Maryland Correctional Institution at Hagerstown who have below average intelligence. September 3, 1965.

41 Patuxent Institution records of Elwood Towers.

42 Patuxent Institution records of John Bressler, Jr.

43 "Standards for Hospitals and Clinics" published by American Psychiatric Association, June, 1958.

44 Department of Mental Hygiene chart, hospital capacities and patient population and ratios of budgeted professional staff to in-patient population, July 31, 1965.

45 Patuxent Institution records of Charles Tippett.

46 Patuxent Institution records of Albert P. Murel.

47 Patuxent Institution records of Albert E. Hawkins.

48 Patuxent Institution records of Edward Moulsdale.

49 Patuxent Institution records of William McDonough.

50 Patuxent Institution records of Charles Crause.

51 Sample of a Patuxent Institution Board of Review —Progress Note.

52 Statistics from R. N. Michael, Classification Supervisor to H. M. Boslow, Director, as to patients who were committed as defective delinquents, later released at re-hearings, and who were subsequently convicted of another offense. August 31, 1965.

53 Statistics from R. N. Michael, Classification Supervisor to H. M. Boslow, Director, as to patients who were recommended for commitment, but were not committed by the courts, and who were subsequently convicted of a new offense.

54A Report of National Conference of State Trial Judges Committee on "The Sociopathic Offender and the

Exhibit
Number

Courts" The Honorable William K. Thomas, Chairman, 1964.

54B National Conference of State Trial Judges, Digest of the report of the committee on "The Sociopathic Offender and the Courts" 1964, The Honorable William K. Thomas, Chairman.

55 Report of Committee on "The Sociopathic Offender and the Courts," presented August 8, 1965, to National Conference of State Trial Judges. The Honorable William K. Thomas, Chairman.

56 Release record statistics as to patients committed to Patuxent from January, 1955 to June 30, 1965.

57A Excerpt from the second report of Maryland Self-Survey Commission—relating to Department of Correction, 1958, by Sanford Bates.

57B "Reports of Surveys, Maryland Department of Correction and Patuxent Institution," by Sanford Bates, October 30, 1959.

58A-L Photographs of Patuxent Institution.

59 Address on Defective Delinquency; delivered by Honorable Jerome Robinson, Maryland House of Delegates at the General Assembly of the States Council of State Governments. December 5, 1958.

60 Address by The Honorable Reuben Oppenheimer, "Criminal Defectives and The Maryland Law" Mid-Winter Meeting of the Maryland State Bar Association. 1949.

61A Statistics as to comparable average salaries of the Patuxent Institution personnel, February 18, 1965.

61B Statistics comparing Maryland salaries of Patuxent professional staff with those of other states prepared by Robin J. Zee, Director, Classification and Compensation, September 20, 1965.

62 Patuxent Institution record of James Craig.

63 Parole experience of 135 paroled from opening of Patuxent through October 26, 1965.

74

64    Deposition of John Sas given August 16, 1965, and a
      certified copy of the court proceedings held in Balti-
      more City on Monday, November 8, 1965, wherein
      John Sas was released from Patuxent following a de-
      termination he was no longer a Defective Delinquent.

For the reasons given in this opinion and the opinion of the
trial court just reproduced, the order releasing Daniels and the
orders holding and declaring the Act constitutional on its face
and in operation will be affirmed.

> *Order releasing Daniels and orders*
> *holding and declaring the Act*
> *constitutional on its face and in*
> *operation affirmed, the costs to be*
> *paid by Prince George's County.*