SAM ZIMMERMAN, a/k/a SAMUEL DANIELS,
a/k/a SAMUEL BROWN *v.* STATE OF
MARYLAND

[No. 440, September Term, 1969.]

*Decided May 27, 1970.*

The cause was submitted to MURPHY, C.J., and ANDER-SON, MORTON, ORTH, and THOMPSON, JJ.

*Leonard A. Briscoe* for appellant.

*Robert A. DiCicco, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Robert F. Fischer, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the majority opinion of the Court. THOMPSON, J., dissents. Dissenting opinion by THOMPSON, J., at page 498 *infra.*

Appellant here is not unknown in the administration of criminal justice in this State. Apparently content with the forename of Samuel or contractions thereof (Sam) or diminutive forms thereof (Sammy), from time to time he fancies different surnames. He is the Samuel Daniels of *Daniels v. Director,* 238 Md. 80 (1965) and *Director v. Daniels,* 243 Md. 16 (1966). He is the Samuel Brown of *Brown v. State,* 5 Md. App. 367 (1968). When accosted by the police in the instant case he gave the name of Sammy Zimmerman. In *Daniels v. Director, supra,* the Court reviewed his background.

> "The applicant, who is twenty-four years old and has no known relatives, was taken in protective custody as an infant and lived in foster

homes during most of his early childhood. Since then he has been confined from time to time in Boys' Village, State Reformatory for Males and Patuxent Institution. He has a history of stealing money and other property from his foster parents and from inmates of the institutions in which he resided. When he was about fourteen he attempted to have sexual relations with a seven year old girl. The institutional records further indicate that he has continued to be somewhat of a 'sexual problem.'

Six years ago the applicant pled guilty to storehouse breaking and larceny and was sentenced to an indeterminate term not exceeding three years in the Reformatory from which he was subsequently transferred to Patuxent for examination. Sometime later a jury found him to be a defective delinquent. During the initial period of his confinement and treatment at Patuxent, he was promoted from time to time until he reached the fourth tier, which is the tier inmates must reach to be eligible for probationary or final release, but he was subsequently demoted to a lower tier. Whether he thereafter regained fourth tier status is not clear from the record.

Whatever his status may have been at the time of the redetermination hearing, the medical records of the institution and the depositions of staff personnel—a psychiatrist and a psychologist—show that the applicant, as the jury found, is not yet ready to be released. Within the statutory definition, the applicant exhibits 'intellectual deficiency' in that he has an I.Q. of 76. There is also substantial evidence of 'emotional unbalance' due to his low intellectual level and his lack of control over his 'explosive and aggressive impulses.' The psychiatrist was of the opinion that 'in spite of some gains he has made

more recently in terms of behavior, he remains a very impulsive, bitter, suspicious and thoughtless individual with a poor prognosis for rehabilitation.' "

However, the case was remanded so he could have the opportunity to show that by his incarceration in Patuxent Institution he was in fact confined in a penal institution undergoing punishment rather than treatment for his alleged defective delinquency in violation of his constitutional rights. But on remand it was determined that none of the five prerequisites of conviction for a specified crime set out in Code, Art. 31B, § 6 existed for his referral to Patuxent and the lower court ordered he be released. The order was affirmed in *Director v. Daniels, supra,* at 24. After his release he was employed by the First Unitarian Church, Charles and Franklin Streets, in Baltimore, Maryland, working once a week doing janitorial work under the supervision of the sexton. On 12 November 1967 he was observed by a police officer at 4:45 A.M. pushing a baby carriage in the vicinity of Hamilton Street and Park Avenue. The carriage had a price tag attached and contained "cans of coffee and crackers and some clothing strewed about and boxes of jewelry." He told the police he found the articles in an alley and was arrested. It subsequently developed that the carriage and its contents had been stolen in a breaking of the First Unitarian Church and under the name of Samuel Brown he was convicted of the breaking and the stealing of the property. We reversed the judgment in *Brown v. State, supra,* a majority of the Court finding that, in the circumstances, there was no probable cause for the arrest. Undeterred by these close escapes, he leaped into the well again.[1] On 24 April 1969 about 12:40 A.M. Sergeant Frank Reitter of the Tactical Unit of the Baltimore City Police Department, and two other officers, in a marked departmental vehicle, saw him crossing Eutaw Street at its intersec-

---

1. "If you leap into a well, Providence is not bound to fetch you out." *Gnomologia,* Thomas Fuller.

tion with Centre Street. He was carrying two record players. He "looked to see as to where we were going." The police officers went half a block past him and made a U-turn. As they drove back he set the two record players down. One of them, a table model, was two and a half feet square and a foot and a half high and appellant was carrying it on his shoulder. The other, a portable type, was enclosed in a case with a handle. It was about a foot and a half square and eight inches high. On this record player the sergeant saw "plainly written" the name "First Unitarian Church." The officers accosted him, asking him his name and where he had been. He said his name was Sammy Zimmerman and that he was coming from a party. He was unable to produce any identification. Reitter remembered him. "Then seeing the [name of First Unitarian Church] and seeing the person identified now as Sam Zimmerman, I recall that he was associated in a burglary back a few years ago and I had interviewed him and I knew that his name wasn't Zimmerman. However the name Sammy did stay with him. * * * At this point I then spoke up and said, 'Sam, I had you once before on a burglary case and your name is not Zimmerman,' and Sammy said, 'No, you didn't have me, sir.' I said, 'It's from the same church, Sam, First Unitarian Church.' Sam says, 'No sir, it wasn't me.' I said, 'Where did you get this property?' Sam says, 'I found it on the street.' " The officers asked where the party was he was coming from but Sam "wouldn't come up with any more answers, saying he was going home which was at 301 East Lafayette Avenue on the north side of the street." The officer recalled that uneven house numbers were on the south side of the street. Asked where he was going when they saw him, he said to Fremont Avenue, a friend's house, name unknown. "He became very evasive. I told him we had recent burglaries of that church, as many as three to four within the past two months and I had reason to believe that he was the one that was responsible." He was placed under arrest. Inside the table model record player was a mop head to a large janitorial type mop.

Reverend Howard Waterhouse was the minister in charge of the First Unitarian Church at Charles and Franklin Streets. He received a telephone call from the police in the early morning hours of 24 April 1969 and went to the Church. The police arrived shortly thereafter. On the ground floor, at the rear of the West Franklin Street building, which is the church school building, a window with a frame and protective mesh had been "ripped right out of the cement block wall." The window had been secured at 5:00 P.M. the day before. A window on the second floor had also been opened. He identified the two record players as church property which was missing. He could not identify the mop head.

The sexton of the church said he knew the accused by the name of Sam Daniels. Daniels worked in the church in 1966, doing cleaning work. The sexton identified the record players as the property of the church and said that a wet mop was also missing. He gave $159 as the value of one of the record players.

On this evidence Samuel Zimmerman-Brown-Daniels was convicted at a court trial in the Criminal Court of Baltimore of breaking the First Unitarian Church and stealing property of the value of $5 and upwards. At the trial he claimed he did not have the record players in his possession when he was arrested and denied that he stole them or broke into the Church. He appeals from the judgment.

Appellant was arraigned on 10 June 1969 and having no lawyer and being indigent the court informed him that a lawyer would be appointed, entered a plea of not guilty on his behalf and reserved the question of court or jury trial. A lawyer was appointed the same day and entered his appearance on 16 June. On 3 September the case came on for trial. The transcript reads:

> "THE CLERK: This is Indictment No. 3273, the docket of 1969. The State of Maryland charges Mr. Zimmerman with the crime of burglary. Mr. Zimmerman was arraigned

on June 10th, 1969, and at that time a not guilty plea was entered on his behalf.

Counsel, the plea today is. . . . .

MR. MERKER (defense counsel) : Not guilty.

THE CLERK: How does he wish to be tried?

MR. MERKER: By the Court.

THE CLERK: Mr. Merker; you are Court appointed in this case?

MR. MERKER: Yes."

The State called its first witness. Appellant contends that the lower court erred in failing to determine whether or not he intelligently waived his right to a jury trial.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed * * *." Amendment VI, Constitution of the United States.[2] This right to trial by jury is applicable to state criminal prosecutions.

"Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's guarantee." *Duncan v. State of Louisiana,* 391 U. S. 145, 149, decided 20 May 1968.[3]

Compare *Bristow v. State,* 242 Md. 283, 289 (1966). Maryland Rule 741 provides, in pertinent part, "An ac-

2. "That the Inhabitants of Maryland are entitled to * * * the trial by Jury * * *." Art. 5, Declaration of Rights, Constitution of Maryland. "That in all criminal prosecutions, every man hath a right * * * to a speedy trial by an impartial jury * * *." *Id.* Art. 21.

3. "Crimes carrying possible penalties up to six months do not require a jury trial if they otherwise qualify as petty offenses. * * * But the penalty authorized for a particular crime is of major relevance in determining whether it is serious or not and may in itself, if severe enough, subject the trial to the mandates of the Sixth Amendment." *Id.* at 159. In the federal system petty offenses are defined as those punishable by no more than 6 months in prison and a $500 fine. 18 U.S.C. § 1.

cused may waive a jury trial and elect to be tried by the court." The waiver and election this Rule authorizes is constitutional. "[W]e hold no constitutional doubts about the practices, common in both federal and state courts, of accepting waivers of jury trial and prosecuting petty crimes without extending a right to jury trial." *Duncan*, at 158.[4] The question is what constitutes an effective waiver of a jury trial.

The rule as to waiver is clearly expressed in *Brookhart v. Janis*, 384 U. S. 1 (1966) at 4:

"The question of a waiver of a federally guaranteed constitutional right is, of course, a federal question controlled by federal law. There is a presumption against the waiver of constitutional rights, see *e.g. Glasser v. United States*, 315 U. S. 60, 70-71, 62 S. Ct. 457, 464-465, 86 L. Ed. 680, and for a waiver to be effective it must be clearly established that there was 'an

4. In *Rose v. State*, 177 Md. 577 (1940) the Court said, at 581, with respect to the election to be tried by the court:

"Strictly speaking, there is in this no waiver of a requirement of jury trial. It is more accurate to say that an equally normal method is elected. And there is no reason for disapproving it as a deprivation of something an accused should have. It is demonstrated that there is a pronounced desire for it. And for persons who fear the effect of any prejudice in the jury box, racial or other prejudice, it is a boon.

Clearly therefore the appellant suffered no deprivation in being given her election, and there was nothing improper in trying her case as it was tried. Her attorney's object that the recitals in the docket entries do not show that the election was made by the accused in person rather than by attorney, or show other desirable safeguards, but nothing else is required under the law and regular practice. The recital is that she made the election. But if her attorney made it, that was regular and proper."

We think that *Rose*, to the extent that it holds that election of a court trial is not a waiver of the right to a jury trial, is not now controlling. We believe that an accused may be tried by the court in the prosecution of crimes within the Sixth Amendment's guarantee only if he waives, in the constitutional sense, his right to trial by jury. Thus the election of a court trial by counsel of an accused, unless it be shown that there was an effective waiver of the right to a jury trial by the accused, would no longer be "regular and proper."

intentional relinquishment or abandonment of a known right or privilege.' Johnson v. Zerbst, 304 U. S. 458, 464, 58 S. Ct. 1019, 1023; 82 L. Ed. 1461."

Presuming waiver from a silent record is ordinarily impermissible, *Wayne v. State,* 4 Md. App. 424, and we must indulge every reasonable presumption against waiver and not presume acquiescence in the loss of fundamental rights, *Moore a/k/a Smith v. State,* 7 Md. App. 330, 334. Cf. *State v. Howard,* 7 Md. App. 429.

When constitutional rights turn on the resolution of a factual dispute we are duty bound to make an independent examination of the whole record. See *Edwards v. South Carolina,* 372 U. S. 229, 235. We are unable to resolve the question here on the record before us. It does not show that appellant personally waived his right to a jury trial nor can we say that it "clearly established" that there was acknowledgeable acquiescence in his lawyer's waiver. It is not sufficient to show that appellant even knew he had a right to a trial by jury. The only time the word "jury" was mentioned was at the first arraignment when the judge presiding stated that the question of court or jury trial would be reserved. No mention whatsoever was made of a jury trial on the rearraignment. No effort was made by the court or defense counsel to have the record reflect appellant's knowledge of his right to a jury trial or his acquiescence to the court trial elected by his counsel. It was stated in *Henry v. Mississippi,* 379 U. S. 443, 451 that counsel may, under some conditions, where the circumstances are not "exceptional, preclude the accused from asserting constitutional claims * * *." And in *Bristow v. State, supra,* at 290, the Court remarked, citing *Henry,* that "there are situations in which a defendant may be bound by the reasoned tactical actions of his counsel taken without that defendant's express consent and participation." But there is nothing in *Henry* which permits us to find on the bare-bones record before us that appellant effectively waived his right to a

trial by jury. Therefore, instead of entertaining a final order affirming, reversing or modifying the judgment, we remand the case to the lower court for the purpose of the introduction of additional evidence, or otherwise, as may be necessary, for a determination by the lower court whether or not appellant knew of his right to a jury trial and intentionally relinquished or abandoned it, as if no appeal had been taken and the judgment from which the appeal was taken had not been entered. Rule 1071 a. Upon such determination the record shall be returned to us.

Even though we remand the case, we think it advisable to decide the question presented by appellant as to the denial of his motion to suppress evidence. He contends the court erred in denying the motion because the evidence challenged was obtained by a seizure unreasonable as incident to an illegal arrest. The motion was determined during the trial after the testimony of Sergeant Reitter was adduced. It is firmly established that a police officer may make a valid arrest without a warrant when he has probable cause to believe that a felony has been committed and that the arrestee committed it. *Cleveland v. State*, 8 Md. App. 204. The initial confrontation of appellant was an accosting by the police. See *Tierney v. State*, 7 Md. App. 56. Considering the time of day, the articles carried by appellant in full view, the observation by the arresting officer of the name "First Unitarian Church" written on one of the record players, his knowledge that the church had been broken into three or four times in the preceding two months, his knowledge that appellant had given a different name on a prior occasion, appellant's lack of identification, his incredible story that he had found the articles on the street and his unsupported statements as to where he had been, where he was going and where he lived, constituted probable cause for the officer to believe that appellant had committed a felony, e.g., breaking the First Unitarian Church and stealing goods of the value of $5 or upwards, Code, Art. 27, § 33, or grand larceny, Art. 27, § 340. See *Radcliffe v. State*, 6 Md. App. 285. Thus the arrest was legal,

the seizure of the challenged evidence was reasonable as incident thereto and denial of the motion to suppress was not error.

We note that appellant's claim that the evidence was not sufficient to sustain the conviction is predicated on the alleged inadmissibility of the articles seized incident to his arrest. As we have found the articles were properly admissible, the contention falls. Appellant was found in exclusive possession of recently stolen goods and made no reasonable explanation of his possession. This was enough to establish his criminal agency, the *corpus delicti* being proved. *Graham v. State,* 6 Md. App. 458; *Ervin v. State,* 4 Md. App. 42.

> *Case remanded without affirming, reversing or modifying the judgment for further proceedings in accordance with this opinion.*

THOMPSON, J., dissenting:

I cannot agree with my colleagues that this case should be remanded. They say the record does not show the accused intelligently and knowingly waived his federal constitutional right to a jury trial when his counsel, in his presence, stood up in open court and elected to be tried by the court. They cite no Supreme Court decision directly in point and in note 4 say a contrary decision of the Court of Appeals is no longer the law.

An accused has a federal constitutional right to cross-examine witnesses against him, *Bruton v. United States,* 391 U. S. 123, 88 S. Ct. 1620, 20 L.Ed.2d 476. Does this mean that everytime a defense attorney decides not to cross-examine a particular witness the trial must be stopped while inquiry is made as to whether or not the accused is personally making an intelligent and knowing waiver? I think not. Recent decisions have gone far in this direction, *Boykin v. Alabama,* 395 U. S. 238, 89 S. Ct. 1709, 23 L.Ed.2d 274, but there may be a ray of hope

the trend has ended, and the role of counsel may be restored to its proper place. See the following opinions of the Supreme Court, all of which were filed May 4, 1970: *McMann v. Richardson,* No. 153 October Term, 1969, 7 CrL 3055, *Brady v. United States,* No. 270 October Term, 1969, 7 CrL 3064, and *Parker v. North Carolina,* No. 268 October Term, 1969, 7 CrL 3069.

The majority opinion shows the accused has an I.Q. of only 76, but it also shows he was being tried for his third felony. If on these facts he did not understand his counsel was waiving his right to a jury trial, a more appropriate query might be his mental capacity to stand trial at all.

As disturbing as it is to burden the trial court with what appears to me to be a frivolous hearing, the procedural aspects are even more disturbing. The appellant has never personally stated that he did not understand the waiver; it has only been suggested by his appellate counsel. The question has not, as in *State v. Howard,* 7 Md. App. 429, 256 A. 2d 192, been presented to a trial court for determination.

If in fact the appellant did not understand the waiver, he is not without remedy. A trial judge must appoint counsel, if the appellant is indigent, and conduct a hearing on his first petition for post conviction relief and must consider this issue or any others appropriately raised. *Taylor v. Director,* 1 Md. App. 23, 226 A. 2d 358. The proper time for this Court to concern itself with the issue is after it is properly raised and decided by a trial judge. Maryland Rule 1085, directing us to consider, ordinarily, only questions raised and decided below, is founded on solid ground, and should, in my judgment, be applied here. The procedure I have outlined would seem to be clearly constitutional. In *Parker v. North Carolina, supra,* 7 CrL 3071, the Court said:

"We also have before us the question whether the indictment to which Parker pleaded is invalid because members of his race were allegedly

systematically excluded from the grand jury which returned the indictment. The North Carolina Court of Appeals refused to consider the claim since under North Carolina law an objection to the composition of the grand jury must be raised by motion to quash the indictment prior to the entry of the guilty plea. Because Parker had failed to raise his objection in timely fashion, relief was unavailable. This state rule of practice would constitute an adequate state ground precluding our reaching the grand jury issue if this case were here on direct review. See *Fay v. Noia,* 372 U. S. 391, 428-429 (1963). We are under similar constraint when asked to review a state court decision holding that the same rule of practice requires denial of collateral relief. *Ibid.* Whether the question of racial exclusion in the selection of the grand jury is open in a federal habeas corpus action we need not decide."