## JOHN FRANCIS MILLER v. WARDEN, MARYLAND HOUSE OF CORRECTION

[App. No. 64, September Term, 1972.]

*Decided January 26, 1973.*

Before MOYLAN, GILBERT and SCANLAN, JJ.

*Fred Warren Bennett* for applicant.

*Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Richard P. Arnold, Assistant State's Attorney for Prince George's County,* for respondent.

MOYLAN, J., delivered the opinion of the Court.

The only thing that can be said about constitutional waiver in the abstract is that nothing can be said about constitutional waiver in the abstract. It is as protean in its manifestations as the number of constitutional rights which there are to be waived multiplied by the number of circumstances in which they may be waived. It is unnecessary in deciding the case before us to attempt to analyze this shifting quality of waiver in its manifold contexts.[1] Even a partial cataloguing of its applications illustrates the breadth of the spectrum through which it vacillates —operating at times with fastidious forbearance, at times blithely and summarily, and frequently with coquettish inconstancy.

At one end of the spectrum, the tendering of a guilty plea in lieu of standing trial—the collective waiver of all constitutional rights in one fell swoop—is circumscribed with rigid precautions. It must be shown affirmatively on the face of the record that the defendant has been informed of at least three of the constitutional rights subsumed in the right to trial and that he knowingly and voluntarily relinquishes those rights. *Boykin v. Alabama,*

---

1. But see Tigar, *The Supreme Court, 1969 Term, Forward: Waiver of Constitutional Rights: Disquiet in the Citadel,* 84 Harv. L. Rev. 1 (1970) ; White, *Federal Habeas Corpus: The Impact of the Failure to Assert a Constitutional Claim at Trial,* 58 Va. L. Rev. 67 (1972) ; Comment, *Criminal Waiver: The Requirements of Personal Participation, Competence and Legitimate State Interest,* 54 Cal. L. Rev. 1262 (1966).

395 U. S. 238.[2] The collective relinquishment of rights by a plea of *nolo contendere* is no less sweeping and the waiver standard is not diminished. *North Carolina v. Alford,* 400 U. S. 25; *McCall v. State,* 9 Md. App. 191; *Williams v. State,* 10 Md. App. 570. The waiver of the Sixth Amendment right to the assistance of counsel at a trial proper is little less rigid. Speaking in that context, *Johnson v. Zerbst,* 304 U. S. 458, 464, has become the rhetorical wellspring for most of our restrictive waiver language, " '[C]ourts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." In the context of the same constitutional right, *Carnley v. Cochran,* 369 U. S. 506, at 516, echoes *Johnson v. Zerbst,* "Presuming waiver from a silent record is impermissible." The Sixth Amendment right to the assistance of counsel at other "critical stages", however, shades off gradually in terms of our reluctance to presume waiver either from the actions of the accused or from his complete inaction. An accused has the right to the assistance of counsel during the course of a custodial interrogation. *Miranda v. Arizona,* 384 U. S. 436. He must be informed of that right. Once having been informed, however, his waiver of it is implicit in a *prima facie* showing that a subsequent confession was freely and voluntarily made. *Barnhart v. State,* 5 Md. App. 222. An accused has the right to the assistance of counsel when he is placed in a police lineup. *United States v. Wade,* 388 U. S. 218. Yet a denial of that right will avail him naught, if he fails to object at trial either to direct evidence of that lineup identification or to a courtroom

---

2. Since the purpose of the in-court recitation about the three rights is to make certain that they are "known" so that they may be "knowingly" relinquished, Tigar, *supra* n. 1, questions whether the many other constitutional rights also relinquished by a plea of guilty have been adequately established as having been "known" rights. He finds anomalous the disparity in treatment between rights and rights.

identification possibly stemming from that lineup identification. *Smith and Samuels v. State,* 6 Md. App. 59.

An accused waives his Fourth Amendment protections whenever he consents to a search of his person or his property which the police would not be authorized to make absent that consent. The Supreme Court speaks of this consent having to be "freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U. S. 543, 548-549.[3] Consent to search given by a third party—friend, relative, landlord or employer—is sometimes rationalized on the basis of property rights and standing to object and sometimes rationalized on a theory of "vicarious waiver" or assumption of risk that the agent will consent to the search. *Frazier v. Cupp,* 394 U. S. 731. Other Fourth Amendment waivers occur prior to and in the course of the trial process. Even when physical evidence is seized in clear contravention of an accused's Fourth Amendment rights, the failure, apparent from the mere silence of the record, to demand a pretrial suppression hearing or to object to the evidence when it is introduced will be dispositive of the constitutional protection. There is no requirement that an accused be informed, on the face of the record or anywhere else, of his right to move to suppress evidence or to object to its admission. There is no requirement that his acquiescence in the waiver of his Fourth Amendment protection be shown to have been

3. Tigar, *supra* n. 1, at p. 11:
"The cases which deal with consent to search illustrate another aspect of the problem of waiver. The archetypal search and seizure consent, involving a search for tangible evidence, is given at the threshold, after an officer asks whether he can come in and look around. Most courts accept such consent as voluntary, absent a demonstration that the party was overwhelmed by 'authority.' The Court has not yet addressed itself to the question of whether the party consenting must be informed of his rights in the matter. Here again the *Johnson* standard is dishonored, and the shadow of consent taken for its substance."

knowing and voluntary. *Henry v. Mississippi,* 379 U. S. 443; *Reid v. State,* 10 Md. App. 6.

In the area of Fifth Amendment guarantees, the protection against double jeopardy is waived if the defendant fails to interpose his plea at the inception of a second prosecution. 21 Am.Jur.2d, *Criminal Law,* § 165, p. 231. Similarly, the election of a convicted defendant to seek appellate reversal or the election of a defendant on trial to move for a mistrial represents, *ipso facto,* a waiver of any double jeopardy claim upon the new trial. *United States v. Perez,* 22 U. S. 579; *Baker, Whitfield and Wilson v. State,* 15 Md. App. 73. In the self-incrimination area, a witness before a grand jury who answered a few too many questions was held to have "waived" her privilege with respect to additional details since there was no real danger of further incrimination. *Rogers v. United States,* 340 U. S. 367.

In the area of Sixth Amendment protections, it cannot seriously be maintained that a lawyer's "waiving of the reading of the indictment" will not bind his client in terms of the right "to be informed of the nature and cause of the accusation." Nor can it be maintained that the right to "an impartial jury" requires an affirmative explanation of the right to ask for a change of venue, the right to challenge the array, the right to propound certain voir dire questions, the right to challenge for cause and the right to exercise peremptory challenges followed by an express waiver of such rights from the mouth of the accused.

The Sixth Amendment right of confrontation reveals the sliding scale between the degree to which a right is waived and the degree of waiver required at its most volatile. In *Brookhart v. Janis,* 384 U. S. 1, the agreement, by counsel, that "he would not contest the State's case or cross-examine its witnesses but would require only that the State prove" a *prima facie* case, was deemed to be tantamount to a plea of guilty and the rigid waiver

standards of *Johnson v. Zerbst* were observed. There a blanket waiver of all cross-examination of all witnesses was involved. A far lesser question, if not in kind at least in degree, would obviously be presented where a defense attorney agrees to stipulate to the testimony of a single minor or non-controversial witness. Sound trial tactics frequently dictate the acceptance by way of stipulation of a post-mortem autopsy protocol, a ballistics report, a chemist's analysis of suspected drugs, and other reports from the local and national crime laboratories, rather than requiring the experts who conducted the tests to appear in court. Each of these stipulations involves, to be sure, a waiver of the right of confrontation, but of a type frequently indulged in throughout a trial.[4] The right to cross-examine a witness is an integral part of the right of confrontation. *Pointer v. Texas,* 380 U. S. 400. The remarks of Judge Thompson in *Zimmerman v. State,* 9 Md. App. 488, 498 (dissenting opinion), are appropriate here:

> "An accused has a federal constitutional right to cross-examine witnesses against him, *Bruton v. United States,* 391 U. S. 123, 88 S. Ct. 1620, 20 L.Ed.2d 476. Does this mean that everytime a defense attorney decides not to cross-examine a particular witness the trial must be stopped while inquiry is made as to whether or not the

---

4. The almost inextricable intertwining of the "waiver" question with the "competence of counsel" question is discussed at length in Mazor, *Power and Responsibility in the Attorney-Client Relation,* 20 Stanford L. Rev. 1120 (1968). *Fay v. Noia,* 372 U. S. 391, raised the problem of the extent to which an attorney can waive his client's rights versus the necessity of showing that the client personally relinquished the rights knowingly and voluntarily. In the wake of *Fay v. Noia,* opposite results were reached in *Brookhart v. Janis, supra,* and *Henry v. Mississippi, supra.* In dissent in *Fay v. Noia,* Justice Harlan argued forcefully that to apply the waiver doctrine developed in the right-to-counsel cases "to cases in which a defendant is represented by counsel not shown to be incompetent is to undermine the entire representational system." He noted the irony of a trend downgrading the decision-making capacity of counsel being simultaneous with a counter-trend exalting counsel as being indispensable to criminal defendants.

accused is personally making an intelligent and knowing waiver? I think not."

Further down the sliding scale would be the non-objection by counsel to any shred of testimony involving hearsay information. It cannot seriously be contended that the trial must suspend while a defendant is examined as to the knowledgeability and voluntariness of each passing lapse of total confrontation or that counsel is incapacitated from acting on his own best judgment each time he foregoes an objection or each time he announces, "No questions." The most intriguing variation upon the relinquishment or abandonment of the right to confrontation is that where a defendant may lose his very right to be present at the trial because of waiver through misconduct. *Illinois v. Allen*, 397 U. S. 337; *Jones v. State*, 11 Md. App. 686.[5]

If the waiver, by way of guilty plea, of the general right to trial represents the tight end of the waiver spectrum, the loose end is unquestionably the waiver of the Sixth Amendment right to a speedy trial. Although no longer absolutely dispositive of the speedy trial question adversely to an accused, the failure to demand trial—gleaned from the silent record—is still a strong factor in determining that an accused may have waived the right. *Barker v. Wingo*, 33 L.Ed.2d 101; *State v. Lawless*, 13 Md. App. 220.

5. Tigar, *supra*, n. 1, at 10-11:
"*Allen*, the Court held, had by his courtroom demeanor intentionally relinquished his known right to confront the witness against him. So far as the record reveals, there had been no statement by Allen that he wished not to be present. There had been no explicit statement that he had a constitutional right to be present which he was in danger of waiving, although there was warning that he would be excluded if he persisted in speaking out. ...
... [T]he Court converts waiver into a punitive sanction, but without setting down any new standards or procedures for its application. By seeing the problem as one of waiver, and attempting to force it into the mold of the consensual waiver cases of *Johnson v. Zerbst* and its progeny, the Court did little to explain how rights should be held lost nonconsensually and nothing to help us understand its present view of the *Johnson* test."

The point is that what is true of waiver in the context of one constitutional right is not necessarily true in the context of another constitutional right. What is true of waiver in the context of yielding up all of a certain constitutional right is not necessarily true in the context of yielding up bits of that right selectively. What is true of waiver in the context of foregoing all constitutional rights collectively is not necessarily true in the context of foregoing one of those constitutional rights individually. Waiver is chameleon-like and takes its color from the right which is waived, from the degree to which it is waived, from the forum in which it is waived, from the stage of the proceedings at which it is waived, and from the circumstances under which it is waived.[6]

In the case at bar, the right which was waived was the Sixth Amendment right to trial by jury. We are called upon to evaluate that waiver.

On September 11, 1967, John Francis Miller pleaded guilty in the Circuit Court for Prince George's County to grand larceny. He was sentenced to eight years imprisonment, said sentence was suspended, and he was placed on probation. No direct appeal was taken from that conviction. Having abused the terms of his probation, a writ of attachment was issued against him on April 18, 1968, upon petition by the State's Attorney for Prince George's County. A supplemental petition was filed by the State's

---

6. See Grano, *The Right to Counsel: Collateral Issues Affecting Due Process*, 54 Minn. L. Rev. 1175 (1970), and especially Section III, "Waiving Objections to Unconstitutional Government Conduct," pp. 1208-1239, at 1208:

"The concept of waiver is utilized in various contexts in the criminal justice process. Although defined as an intentional relinquishment or abandonment of a known right or privilege, its real meaning varies with the particular right or privilege involved and the attendant circumstances.

The first application of the waiver doctrine involves the relinquishment of rights or privileges. The privileges that can be waived vary from right to counsel at trial to the right to cross-examine a particular witness. The ease of establishing a valid waiver varies with the privilege involved."

Attorney on July 22, 1970, reciting various specific offenses Miller had committed while on probation. On December 15, 1970, Miller was additionally convicted in the Circuit Court for Prince George's County of burglary and sentenced to ten years imprisonment. His conviction was affirmed by this Court in an unreported per curiam opinion in *Miller v. State*, No. 58, September Term, 1971 (filed October 4, 1971). On December 21, 1970, he pleaded guilty to violation of probation. His suspended sentence under the grand larceny conviction was stricken and the original eight-year sentence was reinstated, to be served consecutively to the ten-year sentence. That judgment was affirmed by this Court in an unreported per curiam opinion in *Miller v. State*, No. 19, September Term, 1971 (filed September 28, 1971).

On February 15, 1972, Miller filed a petition for relief under the post conviction procedure act. He raised various contentions regarding the validity of the grand larceny, burglary, and violation of probation convictions. After a hearing, relief was denied by Judge Robert B. Mathias in an Opinion and Order of Court filed June 13, 1972. This application for leave to appeal follows from that denial of relief.

In his application, the applicant pursues only one of the contentions raised below. He contends that "The order denying petitioner post conviction relief should be reversed because petitioner never effectively waived his constitutional right to a trial by jury" in the burglary conviction.

Maryland Rule 741, "Jury Trial—Waiver," in effect at the time of the applicant's burglary trial,[7] provided:

---

7. The Rule was amended, effective September 1, 1971, to read:
"Rule 741. Jury Trial—Election.
An accused may elect to be tried by jury or by the court. Such election shall be made by the accused in open court when first called upon to plead after he is represented by counsel of record or has waived counsel. If an accused elects to be tried by the court, the State may not elect a jury trial. The court may, in its discretion and for good

"An accused may waive a jury trial and elect to be tried by the court. If an accused elects to be tried by the court the State may not elect a jury trial. An election to be tried by the court must be made before any evidence in the trial on the merits is taken unless otherwise provided by local rule of court."

It is axiomatic that a criminal defendant in Maryland has the right to a trial by jury. This right is conferred by Article 5 and Article 21 of the Maryland Declaration of Rights. It is also conferred by the due process clause of the Fourteenth Amendment to the Federal Constitution, which has been held by *Duncan v. Louisiana,* 391 U. S. 145, to incorporate the jury trial provision of the Sixth Amendment. Our problem is to decide how one elects to exercise that right or, alternatively, how one waives that right. The recognition of the right under the Maryland Declaration of Rights being fifteen years senior to the recognition by the Federal Bill of Rights, we are confident that our experience in implementing that right will not lightly be disregarded.

Our preliminary problem is to isolate the precise issue before us. In the language of the artilleryman, we shall "bracket the target." Initially, it is settled that the decision as to mode of trial (however made) must be the decision of the accused himself. Counsel may not "make" (as opposed to "announce") that decision for him. *State v. Howard,* 7 Md. App. 429. Our issue lies beyond that.

At the opposite extreme, it is settled that the decision of the accused in this regard, albeit of necessity made

---

cause shown, at any time prior to the trial permit the accused to change his election."
The amendment was double-edged. It provided that the election should be made by the accused in open court, mechanics as to which the predecessor rule had been silent. The other change was one of deliberate semantics. It deleted all reference to "waiver" of the jury trial and pointedly emphasized "election" between court trial and jury trial. The critical verb became "to elect" and not "to waive."

by him, need not be "announced" by him [8] or shown upon the face of the record. It is sufficient that the decision, even though announced by counsel, have been in fact made or acquiesced in by the accused. It is the true state of the defendant's mind which ultimately must be ascertained. No catechism a la *Boykin* or *Miranda* has been constitutionally prescribed. Even our holding in *Zimmerman v. State*, 9 Md. App. 488, overruled in other regards by *State v. Zimmerman*, 261 Md. 11, did not impose such a ritualistic obligation upon the State or the court.[9] Our issue lies short of this.

It being settled then that the decision must be personal to the accused, on the one hand, but that it need not personally be announced by the accused,[10] on the other hand, we pinpoint our present issue intermediately between those two fixed points—what was the quality of

8. The applicant does, indeed, advance this argument as a second line of defense. His references to *Wayne v. State*, 4 Md. App. 424, and *Moore v. State*, 7 Md. App. 330, are not directly relevant, since they deal with the constitutional "right to counsel." Both cases use the broad language of the Supreme Court in *Johnson v. Zerbst, supra*, and *Carnley v. Cochran, supra*, both of which are also "right to counsel" cases. The applicant's reference to rulings in Illinois, in California, in Michigan and in the Federal system is not helpful, since in those jurisdictions the trial by court is not the time-honored and prestigious alternative to trial by jury which it is in Maryland, but rather occupies inferior status resorted to only when the superior mode is foregone. Indeed, in the Federal system, an accused does not even have the unfettered right of trial by court, if the Government insists upon trial by jury. *Singer v. United States*, 380 U. S. 24.

9. In *Zimmerman*, the election of a court trial was announced by Zimmerman's lawyer. It was impossible to ascertain from the record whether Zimmerman had acquiesced in the decision or not. We attempted to remand the case to the trial court for a further evidentiary finding in order to determine whether there had, in fact, been a knowing and voluntary acquiescence in the decision announced by counsel.

10. In *State v. Zimmerman, supra*, at 25-26, the Court of Appeals wisely points out that "the preferable practice in accepting an election of trial by the court from an accused is for the trial judge at that time to determine on the record whether this is a knowing election on the part of the accused of a court trial in lieu of a jury trial." It makes clear, however, that the suggested guideline is "calculated to reduce litigation" and is not an absolute requirement, the breach of which would be fatal error. It is a suggestion for judicial husbandry and not a constitutional mandate.

the decision, in fact, made by the accused, even if made in the silence of his own thoughts?

In making that determination, we are making an independent constitutional judgment. *Dillingham v. State,* 9 Md. App. 669, 714 (concurring opinion by Orth, J.). In doing so, we give great weight to the findings of Judge Mathias as to the specific, first-level facts (such as what was said and by whom, the demeanor and the courtroom experience of the applicant, the course of the trial itself, the strategic situation facing the applicant, etc.). We must, of course, make our own independent judgment as to what to make of those facts. We must resolve for ourselves the ultimate, second-level fact— the existence or non-existence of an effective waiver. *Walker v. State,* 12 Md. App. 684, 695.

The findings of Judge Mathias are contained in the Opinion and Order of Court:

"The Court finds from the record [that] . . . there was an affirmative indication on the morning of the trial that it would be a Court trial. It is concluded from Mr. Bryan's testimony the petitioner was in the courtroom. . . .

Further, it is imperative that the Court review the facts in this case. It is very obvious that there were two technical questions in this case; whether it was dark or daylight, and the question of whether a penknife in his pocket was, in fact, a dangerous and deadly weapon. It is rather obvious Mr. Bryan was successful in having a judgment of acquittal in Count Two, the penknife. It was the defendant's testimony that gained him that judgment of acquittal in explanation of how he got the penknife.

The Court further finds from the testimony of Mr. Miller and the record that he is not dull and did understand the nature of what was transpiring. Conversely, the Court is convinced that

> Mr. Miller is very streetwise and courtwise. From his testimony and his record he very well knew what was going on in that trial that day, and if he, in fact, did not concur with Mr. Bryan in that trial he certainly would have indicated at that time that he did not concur in it. Therefore, the Court will deny the contention that he did not knowingly and intelligently waive his right to a jury trial in Criminal Trials No. 10,585 for the reasons given and the testimony."

Giving great deference to the first-level findings of Judge Mathias and then making our own independent judgment thereon, we determine the applicant here did knowingly and voluntarily acquiesce in his lawyer's election of a court trial, thereby effectively waiving his right to a jury trial. Nothing in *Zimmerman v. State, supra,* or in *State v. Zimmerman, supra,* persuades us to find otherwise. Although in *Zimmerman v. State,* we tended to emphasize unduly, in the light of *State v. Zimmerman,* the waiver of the jury trial vis-a-vis the venerable Maryland practice of electing between two equally-valued modes of trial, we still did not hold that that waiver must be expressed by the accused personally, on the face of the record. In that case, counsel had elected a court trial. We were unable to conclude whether Zimmerman had or had not knowingly and voluntarily acquiesced in the decision of his counsel. We attempted to send the case back for a further factual finding to resolve that issue. The Court of Appeals, in reversing that decision, held that the appropriate forum for such further factual finding is a post conviction petition hearing and not the trial court upon remand. In either event, there was a factual hearing by Judge Mathias in the case at bar. He determined that the applicant did knowingly and voluntarily waive his right to a jury trial. He supported that finding, in the oral opinion of the court, by pointing out how such an election was the only strategically in-

telligent decision for this court-wise defendant to have
made:

> "A reading of the testimony in the transcript,
> which I recessed to accomplish, would certainly
> indicate that his testimony was rather intelli-
> gent too, after what transpired. He knew what
> kind of trial he was confronted with. He knew
> that the police officers found him in the apart-
> ment. They walked in and he was in there. There
> was a bunch of clothes stacked up in the dining
> room. His buddy was hiding in the closet and
> when the officers told him to come out he said
> he came out. Why? Because he was afraid the
> police were going to shoot through the door.
> He exercised good judgment. That may very
> well have been what would have happened. He
> knew that he was caught. In his opinion Judge
> Bowie said 'red' and did not use the word
> 'handed', but I think he meant that the defen-
> dant was caught red-handed in the apartment.
> Mr. Miller knew what he was confronted with.
> Counsel, if you please, knew what he was con-
> fronted with with a jury. Those facts have a
> definite bearing on who might I believe as to
> whether he intelligently and knowingly waived."

Judge Mathias pointed out, quite astutely, that where
an accused has been caught red-handed and where his
only defenses are of a technical nature,[11] sound strategy
dictates the election of a court trial:

> "At the time he and Bryan both thought it was
> a good idea that with the kind of evidence that
> they had in looking at the transcript, to have a
> Court trial. It is one of those cases that no sen-
> sible lawyer would present to a jury. . ."

---

11. See Bond, *The Maryland Practice of Trying Criminal Cases
By Judges Alone, Without Juries,* 11 A.B.A.J. 699 (1925), at 702:
"Trial before the court alone is sometimes preferred when
a defense is based mainly on a point of law..."

We note, moreover, that the applicant here has, to this day, never indicated that he desired a jury trial. He relies exclusively on what he hopes to be a deficiency on the face of the record. We feel as did the Court of Appeals in *State v. Zimmerman, supra,* at 23:

> "In the state of this record we do not perceive a factual dispute. There was before the court an election of a court trial by counsel in the presence of the accused, the exact situation which appeared in *Rose.* There is nothing in this record to show that Zimmerman ever wanted a jury trial. Even now he does not say he desired a jury trial. If he in fact did want a jury trial, it is odd that he did not express himself when the election was made and did not raise this point in his petition for right to appeal as an indigent, although, as the record indicates, he was not bashful in expressing himself in that petition on other points he regarded as worthy . . ."

We hold that the intelligent and voluntary election of a court trial, announced by applicant's counsel and acquiesced in by the applicant, was an effective waiver of trial by jury. As the Court of Appeals said in *State v. Zimmerman,* at 12:

> "We do not consider whether an accused may elect a court trial, thereby waiving a jury trial. That is established. *Rose v. State,* 177 Md. 577."

If the specific holding of *State v. Zimmerman* was that cases will not be remanded to the trial court for further evidentiary findings, the broad import of *State v. Zimmerman* was to place the waiver question in its proper conceptual context as to modes of trial in first the Colony Palatine and now the Free State of Maryland. The Court of Appeals quotes generously from Chief Judge Carroll

T. Bond in both *Rose v. State,* 177 Md. 577,[12] and in his article, "The Maryland Practice of Trying Criminal Cases by Judges Alone, Without Juries" in 11 A.B.A.J. 699 (1925). It points out that from the founding of this colony until the present day,[13] the court trial has been a qualitatively and quantitatively valuable and valued part of the criminal trial practice of this sovereignty. In the words of Judge Bond:

> "So in this State the practice is one of respectable age, and it seems to Maryland lawyers to be fully as natural a feature of the administration of criminal justice as does the jury trial. They have been quite unaware that there was anything extraordinary in it, and are always surprised when they learn that in other jurisdictions an accused cannot have a trial without a jury if he wishes it.
>
> A docket of jury trials only is something of which Maryland lawyers can hardly conceive; and it would dismay them." 11 A.B.A.J. 701.

Unlike virtually every other American jurisdiction,[14] we

---

12. *State v. Zimmerman* made it clear that *Rose v. State* was still in full vigor and that our partial inhumation of it in *Zimmerman v. State,* at 495, n. 4, was, at best, premature.

13. The trend of recent years has remained true to that analyzed by Chief Judge Bond from pre-Revolutionary times to 1925. The records of the Baltimore City State's Attorney's Office reveal that between 1952 and 1970, between 4,000 and 9,000 criminal indictments were disposed of each year. An average of approximately 14% were disposed of by way of the negotiated guilty plea. The great bulk of the indictments went to trial and were fought out upon the merits. During that eighteen-year-period, the percentage of jury trials fluctuated between 1% and 3%. The percentage of court trials fluctuated between 97% and 99%. The court trial in Baltimore, as in other parts of Maryland, is a stern contest each step of the way. Capital cases are frequently tried before panels of two or three judges and may consume weeks of trial time. As far back as 1872, *League v. State,* 36 Md. 257, recognized that in a multi-judge court trial, majority rule, and not unanimity, would prevail. It is not in diminution of the vigor of the contests that they are played out before faster referees, who do not have to be taught the rules afresh for each new game. See *Sherrill v. State,* 14 Md. App. 146, 157.

14. Of the common law jurisdictions in North America, it is understood that the Maryland experience in this regard is shared only by the Province of Ontario.

have traditionally not even considered the phenomenon in terms of waiving a normal or superior mode of trial by jury for some lesser or abnormal trial by court. We have spoken rather of election between two equals. The precautionary skepticism which, therefore, quite properly, circumscribes such decisions as 1) tendering a guilty plea or 2) proceeding to trial without counsel, would have no place in the routine election of a court trial in Maryland—a tactically dictated selection of forum for a fully contested trial. In this sovereignty, an intelligent and voluntary election of one trial mode is, *ipso facto,* an appropriate waiver of the alternative trial mode.

The waiver of trial by jury in many states is tantamount to a plea of *nolo contendere*—a virtual throwing in of the sponge—a "submission" to the court—and, therefore, a drastically more severe relinquishment of rights than is the waiver in Maryland, which is but the free election of an equally attractive mode of trial.[15] It would be exalting form over substance to impose the same waiver standard upon two such disparate relinquishments. Whatever may have been the broad language of the Supreme Court when dealing with the generality of states, we cannot imagine that that Court, if called upon to focus in on our unique history, would declare Maryland's experience of several hundred years, with no

15. See *Bond, op. cit.,* at 702:
   "The reasons which prompt the choice of a trial before the Court in one case and another are, of course, many and various. Every imaginable reason for thinking that a particular prisoner would stand a better chance of acquittal on the particular charge by the judge presiding than by the jury, must sometimes come into play. Small advantages in strategy, the personality and disposition of the judge, or the makeup of the jury panel—all such considerations must influence the choice and incline counsel now one way and now another. But there are more important reasons. Fear of the effect of popular prejudice upon a jury, either because of the nature of the charge, or because of something connected with the accused personally, is a very frequent ground of choice. It is common for defendants with known bad records to prefer trial before the court alone. And when the crime has aroused anger in the community from which the jury is chosen, trial before the court is frequently preferred."

cry of injustice having been raised, to be beyond the pale of "fundamental fairness" or incompatible with "the concept of ordered liberty." Yet such would be the import of insisting upon trial by jury as the preferred, the superior, the normal mode of trial, which must be knowingly relinquished or abandoned before resort may be had to a lesser and second-class mode of trial. Indeed, in the healthy laboratory of varied state experiences, others may yet follow where the Maryland experiment has led. In macrocosm, three hard fought court trials may represent more fundamental fairness than one hard fought jury trial plus two negotiated guilty pleas.[16] It is an unrealistic appraisal which ignores the total operation of a criminal justice system.

Trial by jury, in the ascendant since the Assize of Clarendon in 1166, has banished from the field such time-honored rivals as trial by ordeal of fire, trial by ordeal of water, trial by compurgation of witnesses and even the more recent Norman innovation of trial by battle. It has not banished from this realm trial by court. Whatever the direction in which our sister sovereignties may wish to travel, we see nothing in the notion of due process which would compel relegating to the attic of practice in this commonwealth, a trial mode which has served

---

**16.** See Moylan, *The Trial of a Criminal Case Before The Court Without a Jury,* 17 Neb. State B. J. 138 (1968), at 139:
> "Because of this heavy reliance in Baltimore on the Court trial, there has been little necessity for plea-bargaining as a method for relieving the criminal docket. In recent years in Baltimore, approximately 14 per cent of all the cases coming to trial in the Baltimore Criminal Courts resulted in pleas of guilty. This is in sharp contrast with most other parts of the country where plea-bargaining is a major factor in the disposition of criminal cases. ... [I]n New York only about 2.5 per cent of the indictments ever actually go to trial and ... the other 97.5 per cent are worked out on a negotiated plea basis. Sometimes armed robbery indictments are compromised not simply down to unarmed robbery, but even all the way down to one year simple assault pleas. By carrying our cases to trial, this type of plea-bargaining ... simply does not have to exist."

us expeditiously, fairly and well since our forefathers planted the common law of England upon these shores.[17]

*Application denied.*

---

17. As an avidly wooed analogy, *Boykin v. Alabama* is currently very much in vogue with criminal defendants. In the case at bar, of course, the applicant sought to impose *Boykin's* catechism upon the constitutional right to trial by jury. In *White v. State,* No. 308, September Term, 1972, filed this day, the defendant there sought to bring the withdrawal of a plea of insanity under its broad umbrella. In an excellent analysis, Judge Scanlan gave the effort short shrift and demonstrated the utter inapplicability of the *Boykin* strictures to the ongoing tactical decisions of the trial table.